FOR IMMEDIATE NEWS RELEASE                    NEWS RELEASE #068

FROM: CLERK OF SUPREME COURT OF LOUISIANA


The Opinion handed down on the **16th day of November, 2016**, ais as follows:


**BY WEIMER, J.**:


2014-KA-2153      STATE OF LOUISIANA v. RODRICUS C. CRAWFORD (Parish of Caddo)

                  DEFENDANT'S CONVICTIONS AND SENTENCES ARE VACATED; REMANDED TO
                  THE TRIAL COURT FOR A NEW TRIAL.

                  JOHNSON, C.J., concurs in result, and dissents in part for
                  reasons assigned by Knoll, J.
                  KNOLL, J., concurs in results and dissents and assigns reasons.
                  CRICHTON, J., dissents in part and assigns reasons.

# SUPREME COURT OF LOUISIANA

## NO. 2014-KA-2153

## STATE OF LOUISIANA

## VERSUS

## RODRICUS C. CRAWFORD

*ON APPEAL FROM THE FIRST JUDICIAL DISTRICT COURT,
FOR THE PARISH OF CADDO*

**WEIMER**, Justice.

This is a direct appeal under La. Const. art. V, § 5(D) by defendant, Rodricus Crawford. Defendant was indicted by a grand jury for the first degree murder of his one-year-old son, committed while engaged in the perpetration of cruelty to juveniles and second degree cruelty to juveniles and while the victim was under twelve years of age. Following the close of evidence, a jury unanimously found defendant guilty as charged and, at the conclusion of the penalty phase of the trial, recommended a sentence of death. The trial court sentenced defendant to death in accordance with that recommendation. In his appeal to this court, defendant raises twenty-three assignments of error. Finding merit in defendant's assignment of error related to his **Batson** challenge,[1] defendant's conviction and sentence are vacated, and this matter is remanded to the trial court for a new trial.

---

[1] See **Batson v. Kentucky**, 476 U.S. 79, 89-90 (1986).

## FACTS AND PROCEDURAL HISTORY

Roderius "Bobo" Lott was born in February 2011 to Lakendra Lott and Rodricus Crawford (defendant). His parents never formally dated, but have been close friends since middle school. The child lived with his mother in a home belonging to her parents, Albert and Sharon White. Defendant lived five houses from his son, where he resided with his mother, grandmother, uncle, and sister. Defendant had an eleventh grade education and worked sporadic jobs. He never held a steady job.

The day his son was born, defendant was present at the hospital. Defendant was described as a proud and loving father of his son and his older daughter, whom he had with a former girlfriend. Defendant often visited his son at the Whites' home, bringing him to the Crawfords' home only for short visits, never to spend the night. Family members indicated that the child was a sweet and happy baby, yet they stated that he often had a runny nose and cold symptoms. One family member stated that the child also had a wheeze. According to family members, these symptoms were not accompanied by fever. When he was eight months old, the child was treated at the hospital for an upper respiratory infection. Although the acute symptoms subsided, his family noted he frequently had cold symptoms.

At the request of defendant's mother, the child's mother dropped the child off at defendant's home on Monday, February 13, 2012, for a few days. On the evening of Wednesday, February 15, the members of the Crawford household, except defendant, attended a party at a relative's home. Defendant stayed home with his son, defendant's younger brother who was visiting, and defendant's friend. Defendant put his son to bed around 9:30 p.m. in the fold-out sofabed the two shared in a bedroom. Shortly after, defendant's mother arrived home and peeked into the bedroom at the

child, who was asleep on his stomach. When defendant's sister returned home a little while later, she also looked in on the child and observed that the child was asleep on his stomach with his head leaning back. Around 11:00 p.m., after smoking two marijuana blunts, defendant joined his son on the sofabed. No one else entered the bedroom that the child occupied until the next morning.

At approximately 7:00 a.m. on Thursday, February 16, defendant's mother was awakened by frantic calls from defendant regarding his son. Upon entering the bedroom, defendant's mother observed defendant sitting on the edge of the bed holding his son, who appeared unresponsive and was cool to the touch. Realizing the child was not breathing, someone in the household called 911, while defendant's mother and sister attempted to perform CPR on the child.

An ambulance arrived shortly after, and defendant ran outside, carrying his son, to meet the emergency medical technicians (EMTs). When asked what had happened, defendant told one of the EMTs that the baby had fallen from the bed. Defendant's statement to this effect was heard by the other attending EMT as well. During their assessment, the EMTs noticed the child was cold to the touch, his eyes were cloudy, and his jaw was stiff, all indications that he had been dead for at least an hour before they arrived. Furthermore, they observed bruising on various parts of the child's right forehead and temporal region and the left side of his face. They also noted blood-tinged fluid draining from one nostril. These observations triggered suspicions of abuse by the EMTs, as they were not consistent with injuries that would have occurred from falling off of a bed.[2] Based on their suspicions, the EMTs contacted their supervisor,[3] who arrived on the scene and further questioned defendant. The

---

[2] The EMTs did not notice the injuries to the child's lips at this time.

[3] Their supervisor passed away prior to the trial of this matter.

EMT supervisor noted in his report that defendant also told him that the child fell off the bed.[4]

After the ambulance left for the hospital, two detectives arrived and searched defendant's home and found a marijuana blunt "roach" in an ashtray. At the police station, after signing a **Miranda** waiver and agreeing to speak to the detectives, defendant admitted to being a habitual marijuana user and to having smoked two blunts before going to bed on February 15. Defendant explained that while he was preparing to give the child a bath on February 15, he had to step out of the bathroom to retrieve a face towel from another room. Upon hearing a cry, he returned to the bathroom and found the child between the toilet and bathtub on all fours with a "busted lip." After washing the blood from the child's lip, defendant "put ice on his lip." Defendant told the detective that he did not know how the child got the mark on his face. Defendant denied telling the EMT supervisor that his son fell off the bed. When the interview was finished, defendant was booked on two unrelated outstanding warrants and sent to the local jail.

Later, the child's mother told the detectives that she observed a bruise on the right side of the child's head near his temple and a busted lip on the morning of February 15, when she went to defendant's home to bring clothes for the child and a nose suction device to clean the mucus from the child's nose. According to the child's mother, defendant had informed her then that the child had fallen in the bathroom near the toilet the night before when defendant was giving him a bath.

One of the detectives contacted the investigator with the coroner's office to convey the information that had been obtained thus far. The investigator relayed the

---

[4] This notation is consistent with the testimony of one of the EMTs, who stated that he had not told the supervisor about the child falling out of the bed.

information to the coroner, Dr. Todd G. Thoma, who met the EMTs at the hospital and began his investigation. The coroner observed several bruises to the child's face, forehead, cheeks, and body, which raised suspicion that the child had been abused. During his investigation, the coroner observed petechial bruising on the child's inner lips.

An autopsy was performed by Dr. James Traylor, Jr., of the University Health Center at Louisiana State University. During the course of the autopsy, Dr. Traylor discovered subcutaneous hemorrhaging on the buttocks, which he opined resulted from blunt force trauma to the buttocks and observed 12 separate contusions to the child's body, including seven on his forehead. The coroner and the doctor both ruled the child's death a homicide. Later, after examining slides of the child's lung tissue, Dr. Traylor discovered that the child was suffering from bilateral early bronchopneumonia, which was present in all five lobes of the child's lungs. The bronchopneumonia, in Dr. Traylor's opinion, was insufficient to have caused the child's death.

After seeking an arrest warrant for defendant for possession of marijuana, second offense, one of the investigating detectives returned to the city jail to interview defendant a second time, at which time defendant was arrested on the marijuana charge. Defendant maintained that he never hit his son or daughter and that he did not suffocate his son. The detective, believing defendant's marijuana consumption before going to sleep to be a contributing factor to the child's death, contacted the district attorney's office and interviewed defendant's family members and acquaintances. Defendant's family members stated that the child had a runny nose in the days before his death, but did not have fever; no one believed his condition was serious enough to require medical attention. All but one family

5

member (the child's mother) denied seeing any bruises on the child's face and buttocks prior to his death.

Based on the coroner's conclusion that the child's death was a homicide and the fact that defendant was the only person with the child when he died, an arrest warrant was obtained for defendant for second degree murder. The detective then interviewed defendant a third time, during which he maintained his innocence and insisted he never abused or smothered his son and that his son sustained a busted lip from a fall in the bathroom on Wednesday, February 15. An indictment for second degree murder followed. Based largely on testimony at a preliminary hearing by Dr. Traylor, who performed the autopsy at the request of the coroner, the state amended the indictment to reflect a charge of first degree murder.

Defendant was subsequently brought to trial. At the conclusion of the jury selection process, defendant moved to quash the petit jury venire on the basis of systematic and intentional underrepresentation of African Americans on the venire panel, specifically African-American males. Additionally, considering the state's exercise of seven peremptory challenges, five of which were used to exclude African-American venire persons, defendant urged that there is "a prima facie case for a **Batson** violation" and requested the trial court "require the State to state race neutral reasons" for its peremptory challenges.

In response to defendant's urging, the trial court stated, "for the record its finding in there's been a prima facie showing" by defendant of a **Batson** violation. The trial court then went through each of the state's peremptory challenges, articulating reasons for the state's strikes. Subsequently, the trial court concluded "there is no prima facie showing at all as to systematic exclusion on the basis of race

6

by the State's exercise of its peremptory challenges," that is, no **Batson** violation occurred.

At trial, the coroner, Dr. Thoma, was accepted as a doctor with special expertise in emergency room medicine, in performing autopsies, and in the determination of the cause and manner of death. Dr. Thoma stated that the child probably died "at least a few hours before" he was pronounced dead at 7:34 a.m. "[S]ignificant bruising across the [child's] face, the head, [and] different areas of the body" was observed by Dr. Thoma. Photographs that were introduced at trial revealed bruising on the child's forehead, the malar surface of his right and left cheeks, the child's upper and lower lips, his right and left temporal area, and his buttocks.[5] Dr. Thoma explained that there was petechial bruising–"bruising on the mucosal surface of … the upper and the lower lip" bilaterally and "[p]redominately … on …the left on the lower part." According to Dr. Thoma, petechial bruising is generally caused by "the lip [being] pushed up against the teeth which causes the bruising." Dr. Thoma stated that petechial bruising is consistent with smothering, but elaborated that the injuries to this child's lips are "classic" signs of mechanical compression of the mouth and nose identified in a medical textbook. There was also "a little bruising under the alar of the nose that looked like mechanical compression of the face." He noted that deaths by asphyxia are not always marked by such "physical findings." A fall, explained Dr. Thoma, will generally cause injury to only one side and would not cause "bruising between the two front teeth."[6] This child had bruising on both sides of his face and lips, as well as the lip tissue that falls between

---

[5] The bruising on the buttocks was slightly visible by external examination, and more pronounced findings were made during autopsy.

[6] On cross examination, Dr. Thoma admitted that separate hits to both sides of the child's face could have caused bilateral bruising.

his upper and lower two front teeth. Dr. Thoma's opinion as to the child's cause of death was strengthened by other areas of bruising, suggestive of "multiple episodes of abuse," which triggered the "whole investigation," but in or of themselves admittedly had nothing to do with the suffocation.

According to Dr. Thoma, early bronchopneumonia is "not terribly unusual in children." The presence of bronchopneumonia is not automatically fatal in children. Dr. Thoma opined that the child's bronchopneumonia "was not significant enough to have killed the child" and had nothing to do with his death.

Dr. Thoma explained that "[s]epsis is a situation where bacteria from whatever infection you may have, whether it be pneumonia, sore throat, prostatitis, urinary tract ... get[s] into the bloodstream" and "sets up a systemic infection." When the infection "gets to be severe, you get shaking, rigors and high fever, they get very, very deathly ill, and then over a period of time people will go into … septic shock, meaning that organs will start to dysfunction, your blood pressure will drop down low." Sepsis is a very obvious condition that results in "a very toxic looking child" marked by dehydration. Dr. Thoma testified that this child, if septic, would have had extremely high fever (at the 104, 105, 106 level) with a cough and been restless and irritable.

Dr. Traylor, who performed the child's autopsy which began around 8:30 a.m., was accepted by the trial court as an expert medical doctor with a special expertise in clinical, anatomic, and forensic pathology. The child's time of death was determined by Dr. Traylor to be "between 6:30 a.m. on February 16, 2012 and 10:30 p.m. on February 15, 2012, and probably closer to 6:30 a.m." Dr. Traylor testified that abraded contusions of a buccal mucosa–inside of the lip–involving the upper and lower lips indicate the application of firm pressure against the teeth. He added that the small vertical linear bruising on the lower inner lip and the upper inner lip,

8

aligning with the spacing of the front teeth, "implies pressure applied over the mouth, pressing the lip in between." According to Dr. Traylor, these are "typical injuries" from a smothering. Dr. Traylor acknowledged that the injuries to this child's lips could have been caused by "ten, fifteen, twenty seconds" of pressure being applied, but observed that it would have "actually take[n] a lot longer than that," "at least a minute or more," to smother an infant like this child.

Other findings from the autopsy, including the involvement of the thymus gland,[7] abrasions below the left naries and right ala of the nose,[8] and a mild swelling of the brain without herniation,[9] substantiated Dr. Traylor's determination as to cause of death. Considering these injuries and others suggestive of physical abuse (recent contusions to the forehead and both sides of the face[10] and subcutaneous hemorrhages in both sides of the buttocks and the scalp, resulting from multiple blunt force),[11] Dr. Traylor determined the cause of death to be asphyxia secondary to smothering and the manner of death to be homicide. While noting the difficulty in dating bruises with certainty, Dr. Traylor believed that the child's bruises were caused by "recent injuries"–ranging in time from "[d]ays to weeks." Relative to the subcutaneous hemorrhages in the child's buttocks area, Dr. Traylor opined that they were caused

---

[7] Petechiae in the thymus, according to Dr. Traylor, is "commonly found in asphyxia forms of death."

[8] According to Dr. Traylor, the abrasion underneath the child's left naris (the nostril) and a small, little linear abrasion over his right ala (the "winged portion of the nose [that] connects the nostril to the face") "could possibly have been caused at the time of the smothering" by the child or the perpetrator.

[9] The lack of oxygen causes the brain to swell.

[10] The right side of the child's face exhibited bruising (1) above the right eyebrow near the midline and hairline, (2) above and near the eyebrow, (3) above the lateral portion of the eyebrow, (4) on the cheekbone in front of the ear, and (5) just below the cheekbone, while the left side of the child's face had bruising anterior to the ear just above the cheekbone.

[11] A fall from a bed, explained Dr. Traylor, would not have produced the number of contusions found on this child's body.

9

by repeated blunt force that ruptured blood vessels within the last "four hours to several days."

When questioned by defense counsel on cross examination about the injuries to the child's lips, Dr. Traylor stated:

> A. It may look like a busted lip to you, but it doesn't appear as a busted lip to me. As I pointed out earlier, the lower lip, you can see the contusion that's created by the space between the bottom central incisors.
>
> The other image that's the upper central–those are the lower central incisors. The upper lip with the upper central incisors, they line up perfectly.
>
> Q. So what? "They line up perfectly"; what does–
>
> A. That means, there's pressure that's placed on the mouth that forces the mucosa in between those teeth for a period of time.

In response to defense counsel's inquiry about other possible causes of such an injury, Dr. Traylor stated that there are "four distinct areas" of contusions inside of the child's lips:

> two on the lower lip and upper lip–and they're well defined. They match the spacing of the teeth as well as other teeth that are there. It means that pressure was applied over the mouth and that's what caused those marks there.

Defense counsel then asked, "That's the only way that those injuries could be caused?" Dr. Traylor responded:

> Those are the typical injuries that if you're lucky enough to see with smothering other than possibly maybe a little abrasion to the tip of the nose from either a pillow or a sheet; you may see that. But typically, you know, it's referred to as a gentle homicide. Sometimes you don't get any indication of the smothering at all. I think it's fortunate that that was there in this particular case.

Hits to the left side of the upper lip and to the right side of the lower lip by something "the size of a knuckle or … smaller" might cause a similar contusion, but such hits,

in Dr. Traylor's opinion, would not produce the contusions that "show the spacing of the incisors, both upper and lower."

On direct examination by the prosecutor, Dr. Traylor was asked about his diagnosis of bilateral early bronchopneumonia,[12] which he opined was "insufficient … to have accounted for this baby's death, especially in light of the other findings." Although present in all five lobes of the child's lungs, each with "varying degrees of bronchopneumonia," Dr. Traylor stated that "80 to 85 percent of the [child's] lung is well aerated, with the remaining 15 to 20 percent contained in the areas of bronchopneumonia." The infection present in the child was, in Dr. Traylor's opinion, not sufficient enough to prevent "normal respiration." According to Dr. Traylor, for the infection to have rendered the child unable to breath due to septicemia, more of the child's lungs would have to have had concentration/consolidation like that found only in a small focal portion of the child's left upper lobe.

Recognizing that toxins in the bloodstream from pneumonia can cause death, Dr. Traylor explained that the "blood culture positive for alpha hemolytic strepholcocci" revealed that the child did not have streptococcus pneumonia,[13] nor did the child show signs of septicemia or sepsis sufficient to cause death. According to Dr. Traylor, this child did not have "disseminated intravascular coagulation," high fever (102, 103, or 104), or loss of appetite, nor was he "gravely ill in appearance," "obtunded [–barely able to respond], passed out[, or] having trouble breathing."

---

[12] Although a provisional anatomical diagnosis was rendered before the slides evidencing bronchopneumonia were available, the final anatomic diagnosis was not rendered until Dr. Traylor had an opportunity to consider the role, if any, that the bronchopneumonia played in the child's death.

[13] Dr. Traylor explained that "streptococcus pneumoniae … is the bacteria that causes strep throat" or "bronchopneumonia" and is easily identified in a lab. "There are other streptococcal organisms that can cause disease processes" like the organism found in this child that cannot be "speciate[d]" "with biochemical testing."

These are all signs associated with sepsis. There is no evidence that a family member felt that the child was sick enough to require treatment at a hospital in the days before his death. Dr. Traylor recounted "that there's nothing reported that this child was ill or–other than had some sniffles if you will. You don't die from septicemia within a minute."

Shortly before reaching eight months, on October 3, 2011, and again shortly after, the child was treated for congestion/cold symptoms in the emergency room and diagnosed with an upper respiratory infection. According to Dr. Traylor, with proper treatment, the child's condition would have resolved; otherwise, his condition would have gotten worse over the next five months, and the condition of the lungs as evidenced by the slides would have been "a lot worse."

In summarizing his testimony on redirect by the prosecutor, Dr. Traylor testified that all of the child's injuries together reveal "more likely than not … that this child died as a result of smothering." While admitting that it was possible for the child to have died of sepsis or septicemia, Dr. Traylor ruled out that possibility in light of the fact that no one in this child's life considered him to be very ill the day before he died. According to Dr. Traylor, if this child had sepsis, he would have been very ill, and the parents would have known that he needed medical attention.

Defendant offered the expert testimony of Forensic Pathologist Dr. Daniel Joseph Spitz, who works as the chief medical examiner for two counties in Michigan, an assistant professor of pathology at Wayne State University, a clinical educator at Michigan State University, a private consultant, and a contributor to a benchmark book on forensic pathology authored by his father, a renowned forensic pathologist. Dr. Spitz testified that this child was "not a healthy child;" he was coughing and wheezing and had a runny nose. He opined that the child "died as a result of …

bilateral bronchopneumonia" that caused the child to become septic and die "of those infectious complications." The child suffered from "pretty severe bilateral multilobar pneumonia." The pneumonia was present "in multiple areas throughout each section" of the lung. "Some sections of lung actually showed abscessed formation … [with] a large collection with necrosis of the tissue; in other words, dead tissue, as a result of this infection." Dr. Spitz noted that "there was a streptococcal infection … that … was present in the blood, which indicated that this child … was, in fact, septic as a result of this infection" and "can cause significant cardiovascular consequences." This condition, explained Dr. Spitz, "progressed from a viral infection," like the infection he had recently been treated for twice before, "over a period of hours," and "caused the child's death during the nighttime hours." According to Dr. Spitz, the injuries to this child's mouth alone "don't exclude that possibility." In light of these pathologic findings, Dr. Spitz found it "implausible" to conclude that this child "just happened to be smothered in some untoward fashion."

Dr. Spitz disagreed with Dr. Traylor's determination as to the cause of death, explaining that it is difficult to "make a determination of smothering based on small and subtle injuries to the face." "[T]he determination of smothering is a difficult diagnosis," explained Dr. Spitz, which "often has to be made in the context of the totality of the case." He cautioned that "injuries to the mouth [must] be evaluated carefully." According to Dr. Spitz, injuries to the mouth can occur "from any type of force that is applied to the mouth." It is impossible to look at this child's lip "injuries and say how long it took to cause them." Dr. Spitz testified that death by suffocation occurs within one-and-a half to two-and-a-half minutes. According to Dr. Spitz, it is impossible to know from the injuries to the child's lips, "which are very small and subtle," whether "there was compressive force for a period of several minutes." Dr.

13

Spitz explained that "there's no way to separate that possibility from the possibility of this child simply having a force applied to the mouth during the course of some type of accident." It is plausible, stated Dr. Spitz, that the child's mouth injuries were caused by the fall the child reportedly sustained in the bathroom. "[T]hese minor injuries to the face seem very much to have a reasonable explanation and one that makes complete forensic sense: A force to the mouth." Additionally, Dr. Spitz testified that the "small linear abrasion" on the inner lower lip is "high up on the lip" and does not line up anatomically. "Any compressive force to the mouth–an impact, a force, a blow, you bump into something–could account for that injury," especially to a child "learning how to walk." Dr. Spitz opined that the "subtle injuries on the upper part of the lip … are so nonspecific, to suggest anything other than some sort of force[,] and minor in severity[,] is overstepping what these injuries can tell you."

According to Dr. Spitz, not all children with sepsis "follow a textbook pattern of fever, chills, cough, lethargy, hospitalization, … and progressive decline." Dr. Spitz testified that "[s]ome kids, unfortunately, have pneumonia and they progress very quickly, and they can become septic over a period of hours and suffer a more sudden cardiovascular–cardiopulmonary collapse" like, in his view, the child in this case.

Although the child's bruises suggest that he may have been mishandled and abused, Dr. Spitz opined that they "did not cause [the child's] death." While they are factors to be considered in determining a cause of death, "once the case was evaluated fully, including examination of the slides, the cause of death became quite clear" to Dr. Spitz.

On cross examination, the state began by bringing to light information that called Dr. Spitz's credibility and reliability into question. This information related

to his accountability to the board of commissioners as chief medical examiner, a prior autopsy that was botched by Dr. Spitz,[14] the number of autopsies performed by Dr. Spitz,[15] and his numerous other professional responsibilities and workload.[16]

Disagreeing with Dr. Traylor, Dr. Spitz testified that the symptoms suggestive of sepsis in children "are incredibly variable" and can "progress very quickly and can cause cardiopulmonary collapse over a period of hours." According to Dr. Spitz, "this child has a history of upper respiratory infections"; "that history can put [the family] at a heightened awareness of further infection or a progressive infection that puts the child at risk for … developing a bacterial pneumonia." This "child became septic, because he ha[d] pneumonia." "[T]he time between the evening hours of the 15th and the morning hours of the 16th is enough time for this child to become septic," explained Dr. Spitz.

A fall from a bed, stated Dr. Spitz, could have caused the child's lip injuries. "There's nothing about these bruises that allow a forensic pathologist to be certain that they are caused by a prolonged, compressive force. Dr. Spitz admitted that he "never ruled out smothering. [Rather, he] simply said that there are very reasonable explanations for these type of injuries in light of the fact that this child has a bilateral

---

[14] Initially, Dr. Spitz ruled that the cause of death of a man, found after his body had decomposed some 40 days in water, was "undetermined." During a second autopsy performed at the request of the decedent's family, a previously undetected bullet wound was discovered by another medical examiner "at the base of the skull toward the back, kind of behind the ear" suggesting suicide as the cause of death. Also discovered by the other medical examiner was a bullet "lodged up near the teeth," the tissues next to a molar, "near some dental work."

[15] Along with his administrative duties as chief medical examiner on a full-time basis for one county and on a part-time basis in a second county, Dr. Spitz annually performed a large number of autopsies. That number approaches or slightly exceeds the number (325) recommended by the National Group of Medical Examiners, which recommends that this number should be lower for chief medical examiners in light of their administrative duties.

[16] Dr. Spitz also performed private autopsies, lectured various groups that sometimes included attorneys, and worked as a consultant for private attorneys. He is a published author of "a very well-respected book … [that] is used in every medical school across the country" and a clinical educator at Michigan State University School of Medicine.

15

pneumonia, that it's more consistent with the death from pneumonia." "[T]o suggest that this child has a bilateral pneumonia and just happens to be smothered at the same time doesn't make a lot of common or forensic sense," according to Dr. Spitz. Dr. Traylor's opinion is not reasonable "in light of the degree of [the child's] pneumonia."

On rebuttal and in response to Dr. Spitz's testimony, Dr. Traylor reiterated his opinion that the child was not septic and that the child's death was not caused by sepsis. The presence of bacteria in the bloodstream does not always result in death. The child had only a mild, not a severe, case of bronchopneumonia, which the positive blood culture evidenced was not strep pneumonia. "[W]hile sepsis is a possibility," such a condition, in Dr. Traylor's opinion, would produce "a lobar-type pneumonia involving the entire lobe of lung, which you don't see here." The condition of the child's lungs would have been much more severe. According to Dr. Traylor, had the child been septic, he would have had "[l]abored breathing; listlessness; lethargy." "[W]hile … there is bronchopneumonia there, [Dr. Traylor did] not believe that this child died as a direct result of septicemia." If septic, "the child would have manifested symptoms long before" he went to sleep at 9:30 p.m. on February 15, opined Dr. Traylor.

According to Dr. Traylor, "[h]emorrhages and tears to the lining of the oral cavity, including the frenula of the upper and lower lips" speak for themselves. "If it weren't important, why would it be in a benchmark textbook?" questioned Dr. Traylor, referring to the fourth edition of the textbook that was coauthored by Dr. Sptiz and his father, Werner Spitz.

On cross examination during the state's rebuttal, defense counsel questioned Dr. Traylor about his former testimony relating to the cause of death being "more

16

likely than not of smothering." Dr. Taylor clarified, "My opinion is … the death of the child is the result of asphyxia, secondary to smothering." Furthermore, Dr. Traylor (on redirect) explained that he was not using the phrase "more likely than not" in any kind of legal sense in terms of percentages. Dr. Traylor concluded by testifying that he was confident in his opinion that someone smothered the child.

After hearing this testimony along with the testimony of several other witnesses and considering all of the evidence, including the photographs of the child's injuries, a unanimous jury found defendant guilty of the first-degree murder and determined defendant should be sentenced to death. Defendant then filed a motion for new trial, which focused on allegations of the prosecutor's improper use of religion in the penalty phase of trial and the underrepresentation of African Americans in the petit jury venire and a related discovery request, and did not address guilt issues. This motion was denied by the trial court.

In the penalty phase, the trial court noted that the state's attack of defendant's expert, Dr. Spitz, evidently proved effective, stating:

> The only issue presented of any significant debate was that of cause of death, whether it was the smothering or pneumonia.
>
> Expert testimony was presented, the Court found in its opinion the credibility of the witnesses presented by the State to be highly credible and that of the defense expert to be, at best, suspect. The expert of the defendant was attacked on his credibility and veracity, and I believe any veracity that he had was destroyed.
>
> Consequently, based on not only the Court's opinion but also watching the jury during the presentation of that testimony of the experts, it was clear to me that there was no issue of any doubt as to the cause of death; that is, being the smothering of the one year-old child by the defendant.

As recommended by the jury, the trial court sentenced defendant to death. Defendant's subsequently filed motion for reconsideration of sentence was denied.

17

The matter is now before this court on direct appeal under La. Const. art. V, § 5(D) by defendant. During the pendency of this matter, defendant filed a motion to remand with this court in connection with a second motion for new trial that was filed with the trial court, seeking an evidentiary hearing for the development of additional facts that bear on whether a capital crime actually occurred. The evidence sought to be introduced from several new experts in the fields of pediatric pathology, pediatric neuropathology, and pediatric infectious disease confirmed Dr. Spitz's opinion that the child died of natural causes from pneumonia and sepsis. These experts were consulted after the guilty verdict was entered.[17] Defendant's motion to remand was denied by this court on March 16, 2015. After the enrollment of new counsel, defendant filed a "Rule XXVIII Motion to Remand" on August 10, 2016, contending that "more evidence has amassed against Dr. Traylor's opinion that the death was due to homicidal smothering," which bears on "the excessiveness of the sentence imposed." In this pending motion, defendant seeks to have this court remand the case to the trial court for resolution of "the discrepancies between the State's trial expert testimony and the newly-discovered evidence regarding the cause of death."[18]

---

[17] Attached to defendant's motion were the reports of various experts–multiple forensic pathologists, a pediatric neuropathologist, a pediatric neurologist, and an expert pediatric infectious diseases–that contradict the testimony of the state's experts as to the child's cause of death.

[18] In his proposed order, defendant seeks to have this court direct the trial court "to hold an evidentiary hearing to resolve the issues identified in [defendant's] *Second Motion for New Trial*," which is precluded by this court's denial of defendant's prior motion to remand. However, concerning the "Capital sentence review" mandated by La. C.Cr.P. art. 905.9, Rule 28 of the Rules of Supreme Court of Louisiana authorizes this court to "remand the matter for the development of facts relating to whether the sentence is excessive." La. S. Ct. Rule XXVIII, § 5. Therefore, the granting of defendant's currently pending motion to remand would only allow consideration of any new evidence relative to defendant's sentence. Rule 28 does not authorize further review of the jury's guilt determination.

**DISCUSSION**

**A. Sufficiency of the Evidence** (Assignment of Error I)

Although ultimately concluding on other grounds that defendant's conviction and sentence must be reversed and the case remanded for a new trial, the sufficiency of the evidence assignment of error is analyzed first because the lack of sufficient evidence to sustain the conviction would entitle defendant to an acquittal under **Hudson v. Louisiana**, 450 U.S. 40, 44-45 (1981). See **State v. Mickelson**, 12-2539, p. 5 (La. 9/3/14), 149 So.3d 178, 182 (citing **State v. Maxie**, 93-2158 (La. 4/10/95), 653 So.2d 526, 531).

Defendant argues there was insufficient evidence to support a conviction for first-degree murder and the imposition of a death sentence. Specifically, defendant contends (1) the state failed to prove defendant possessed the specific intent to kill or inflict great bodily harm upon the child, (2) the expert forensic testimony presented at trial did not establish beyond a reasonable doubt that a homicide occurred, (3) there was uncontradicted testimony that the primary injury that the state's experts relied on in reaching their conclusion this was a homicide actually occurred the day **before** the child's death, (4) there was no evidence defendant ever abused the child prior to his death, a fundamental tenet in the state's theory of the case, and (5) witnesses expressly rejected the state's proposed motive to commit the alleged homicide.

"[N]o person shall be made to suffer the onus of a criminal conviction except upon sufficient proof-defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." **Jackson v. Virginia**, 443 U.S. 307, 316 (1979). A reviewing court, examining all of the evidence in the light most favorable to the prosecution, must determine whether "*any rational trier of fact could have found the essential elements of the crime beyond a*

reasonable doubt." *Id.* at 319; <u>accord</u> **State v. Brown**, 02-1922, p. 8 (La. 5/20/03), 846 So.2d 715, 721. In **State v. Davis**, 92-1623, p. 11 (La. 5/23/94), 637 So.2d 1012, 1020, a capital case, this court explained:

> In circumstantial evidence cases, this court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. Rather, this court, evaluating the evidence in the light most favorable to the prosecution, determines whether the possible alternative hypothesis is sufficiently **reasonable** that a rational juror could not have found proof of guilt beyond a reasonable doubt under **Jackson v. Virginia**[.]

The **Jackson** standard does not permit this court to substitute its own appreciation of the facts for that of the factfinder. **State v. Robertson**, 96-1048, p. 1 (La. 10/4/96), 680 So.2d 1165, 1166. It is not the province of the reviewing court to assess the credibility of witnesses or reweigh evidence. **State v. Smith**, 94-3116, p. 2 (La. 10/16/95), 661 So.2d 442, 443. As explained in **State v. Mussall**, 523 So.2d 1305, 1310 (La. 1988):

> If *rational* triers of fact could disagree as to the interpretation of the evidence, the *rational* trier's view of all of the evidence most favorable to the prosecution must be adopted. Thus, *irrational* decisions to convict will be overturned, *rational* decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. [Footnote omitted.]

To obtain a conviction for first degree murder under the state's theory of this case, the state had to prove beyond a reasonable doubt that defendant had a specific intent to kill or inflict great bodily harm upon a victim under the age of 12 or while engaged in the perpetration or attempted perpetration of cruelty to juveniles or second degree cruelty to juveniles. <u>See</u> La. R.S. 14:30(A)(1) & (5).

First, defendant argues the forensic testimony presented at trial was insufficient to prove beyond a reasonable doubt that a homicide occurred. Defendant points to Dr. Traylor's opinion as to the cause of the child's death, after observing all of the

20

bruising discovered during the autopsy to the face, scalp, and buttocks "indicates abuse":

> And you put all those things together, *I think it's more likely than not*, in my opinion, that this child died as a result of smothering. [Emphasis added.]

On cross examination, defense counsel confirmed that Dr. Traylor's opinion was that "the injury to the lip … was[,] **more likely than not**[,] a smothering." (Emphasis added.)

Relying on a publication by the National Association of Medical Examiners, A Guide for Manner of Death Classification,[19] which sets forth a general scheme of incremental "degrees of certainty" for classifying the manner of death,[20] defendant now argues that the "more likely than not" classification, "the lowest possible level of certainty an examiner can have while still providing a proposed cause of death," is insufficient to satisfy the state's burden of proof, that is, proof beyond a reasonable doubt. This argument conflates the degree of certainty expressed by the state's expert with the state's burden of proof in a criminal prosecution. As long as the jury rationally found the state proved every element of the offense beyond a reasonable doubt given the totality of the evidence, then Dr. Traylor's statement does not, in and of itself, render defendant's conviction constitutionally infirm, particularly considering his unequivocal testimony on rebuttal that the child's death was caused by smothering.

On rebuttal, when defense counsel sought to underscore the uncertainty in Dr. Traylor's opinion as to the child's cause of death, Dr. Traylor stated that, however he

---

[19]  See RANDY HANZLICK, M.D., ET AL., A GUIDE FOR MANNER OF DEATH CLASSIFICATION, National Association of Medical Examiners (1st Ed. 2002).

[20]  Because the medical examiner's publication was not introduced into evidence and was not the subject of testimony at trial, the state argues the publication should not be considered on appeal.

phrased his testimony during the state's case-in-chief and under cross examination, his unequivocal opinion was that "the death of the child is the result of asphyxia, secondary to smothering."[21] With the prosecutor's discrediting of the defense's expert on cross examination, one may reasonably infer that Dr. Traylor's testimony as to the cause of death substantially contributed to the jury's verdict.

Defendant also notes that Dr. Traylor determined the child's cause of death before he learned of the child's pervasive bronchopneumonia, which, at trial, he acknowledged could have caused the child's death. At the conclusion of the autopsy, Dr. Traylor rendered "a provisional anatomical diagnosis" before the slides, which disclosed bronchopneumonia, became available. However, on receipt of those slides, Dr. Traylor revisited that diagnosis and rendered a "final anatomic diagnosis" after reviewing the case again. His final opinion was "asphyxia, secondary to smothering." This determination was based on (1) the volume of bronchopneumonia in the child's lungs as evidenced by the slides, (2) the absence of streptococcus pneumonia as evidenced by the blood culture, (3) the absence of the classic signs of sepsis, (4) the lack of any evidence that the family members thought the child was sick enough to need medical treatment, and (5) in particular, the presence of "benchmark textbook" signs of smothering, seldom found on victims of this "gentle homicide."

Defendant criticizes Dr. Traylor's methods for failing to collect witness accounts from those who spent time with the child in the days before his death, particularly because those accounts "invariably contained observations of multiple different signs of illness." Neither Dr. Thoma nor Dr. Traylor considered the

---

[21] In light of this testimony, it is unnecessary for this court to consider the medical examiner's publication on appeal.

statements given to police officers from the witnesses who observed the child in the days before his death.

Concerning the child's health, the record reveals the following. The child's maternal grandmother testified the child was a "happy baby," who often has a runny nose; she further testified he had a runny nose, but was not running a fever the last time she saw him alive on Sunday, February 12, 2012. Defendant's mother noted the child had a runny nose and a wheeze, but did not consider the child to be sick in the days before his death to the extent he required medical attention; in fact, she testified he appeared happy and laughing. The child's mother testified she had to bring a nose suction device to defendant's home the day before the child's death because he had a runny nose and a cold. Defendant's brother testified the child "always had the runny nose." Defendant's aunt testified the child "was always sickly-looking," explaining that he always had a "runny nose" and "cold symptoms." According to defendant's aunt, the baby looked sickly the last time she saw him alive on February 14, 2012. A woman who dated defendant for five months prior to the child's death, testified the child was "always a little sick[;] he always had … a runny nose [and] a couple of breathing issues when I would see him." Because he often sounded "a little congested," she offered some of her daughter's cold medicine to defendant for the child, which helped.

Dr. Traylor reported that, in determining the child's cause of death, he was aware that the child "had some sniffles." He was unaware, however, that the mother claimed "the child wheezed all the time" and that the child had a history of "labored breathing."[22] However, at trial, although defendant's mother testified that the child

___

[22] Dr. Traylor explained that in an infant, wheezing is "more high pitched," "kind of like a whine" and is detected by listening to the lungs with a stethoscope.

"had a wheeze," the child's mother denied that the child was wheezing in the days before his death. It is unclear how knowledge of the child's "cold symptoms," breathing issues," or "congest[ion]" would have altered Dr. Traylor's ultimate determination as to the child's cause of death, which considered the presence of early bilateral bronchopneumonia in all the lobes of the child's lungs.

In cases such as this one, where the conviction is based on circumstantial evidence, the prosecution's case must "exclude[] every reasonable hypothesis of innocence." **State v. Captville**, 448 So.2d 676, 678 (La. 1984) (citing La. R.S. 15:438). Whether the evidence presented at trial presented a sufficiently reasonable hypothesis of innocence that a rational trier of fact would necessarily entertain reasonable doubt is a question for this court to consider by "evaluating the evidence in the light most favorable to the prosecution." See **Davis**, 92-1623 at 11, 637 So.2d at 1020.

Defendant argues the state "failed to prove beyond a reasonable doubt the most critical fact underlying Dr. Traylor's conclusion—and, thus, the State's theory—that [defendant] smothered his child to death: the source of the injury to the inside of the child's lip." Dr. Traylor testified that the abraded contusions and small vertical linear bruising inside of the child's lips resulted from the application of "firm pressure that presses against the teeth." The bruising on the child's inner upper and lower lip, explained Dr. Traylor, arose "from pressure being applied, whether from a hand or the infant's face being facedown into a pillow, just firm pressure that presses against the teeth. And the teeth probably are the result of-causing the abrasion and bruising there." Dr. Thoma's testimony about the "petechial bruising" on the child's lips aligns with Dr. Traylor's theory.

The opinion of the state's experts that the bruising to the child's lips was a result of applied force was the primary evidence the child was smothered to death. Notably, the child's mother stated that, when she went to bring the nose suction device to defendant's home on the morning of February 15, she noticed that the child's "lip was busted at the top," which defendant said was caused by the child falling in the bathroom the day before. She provided essentially the same account during her interview shortly after the child's death. This statement is consistent with the statements defendant gave during all three of his custodial interviews. However, the mother testified that the child only had a single bruise under his upper lip. She explained that when she examined his mouth, she did not see a bruise on his lower lip. Accordingly, the single incidence of bruising observed by the child's mother the day before he died was not consistent with the number and nature of the injuries found by Dr. Traylor and Dr. Thoma. The record clearly shows that the child had "bruising on the mucosal [inside] surface of … the upper and the lower lip"–on left side of the lower lip and bilaterally on the upper lip, with small vertical linear bruising on the lower inner lip and the upper inner lip, aligning with the spacing of the front teeth, as well as "a little bruising under the [right] alar of the nose" and an abrasion below the left nares. Even if the child sustained a busted upper lip in a fall in the bathroom on February 14 or a fall from the bed as reported by defendant to the EMT on the morning of the child's death, it appears such a fall could not reasonably account of all of the injuries to the child's upper and lower lips.

However, based on this evidence, the jury could have reasonably believed the state established Dr. Traylor's theory, with which Dr. Thoma agreed, that the bruising was inflicted by defendant's application of manual pressure to the child's mouth. Despite the "consistent with" smothering testimony given by Drs. Traylor and Thoma,

25

Dr. Traylor's subsequent testimony dispelled any problem under **State v. Wright**, 01-0322, p. 13 (La. 12/4/02), 834 So.2d 974, that may have arisen in this case.[23]

Evaluating the evidence in the light most favorable to the prosecution, giving deference to the jury's obvious assessment of credibility and weighing of the evidence, and without substituting our own appreciation of the facts for that of the jury, this court finds that the alternative hypothesis of death by natural causes in this case is not sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under **Jackson**.[24] Accordingly, the jury's decision to convict is upheld.[25]

**B. Batson Challenge** (Assignment of Error IX)

Defendant contends the trial court abused its discretion "when, despite explicitly finding a *prima facie* case of racial discrimination in the State's use of peremptory challenges, it refused to ask the State to provide race-neutral reasons for its challenges." The trial court compounded its error, argues defendant, by denying his **Batson** challenge on the ground that, based on the trial court's articulated reasons, defendant failed to show a systematic exclusion on the basis of race by the use of the state's peremptory challenges. These errors, defendant claims, require reversal or, at a minimum, remand for an evidentiary hearing to allow the state to produce race-neutral reasons for its strikes and allow the defense to respond to those reasons.

---

[23] This court, in **Wright**, found the state failed to establish a rape or attempted rape occurred where the doctor testified she could not be sure of the specific object that penetrated the victim, noting it could have been a thumb, broomstick, mop handle, or a penis; because she could only definitively say the injuries were "consistent with" the penetration by a penis. **Wright**, 01-0322 at 14-16, 834 So.2d at 986-87.

[24] See **Smith**, 94-3116 at 2, 661 So.2d at 443; **Robertson**, 96-1048 at 1, 680 So.2d at 1166; **Davis**, 92-1623 at 11, 637 So.2d at 1020.

[25] See **Mussall**, 523 So.2d at 1310.

An exercise by the state of its peremptory strikes to remove potential jurors from the venire panel solely on the basis of race or gender violates the Equal Protection Clause of the United States Constitution. See **Batson v. Kentucky**, 476 U.S. 79, 89-90 (1986). **Batson** and its progeny from this court provide a three-step process to guide courts in evaluating a claim of racial discrimination in the *voir dire* process:

(1) a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race;

(2) if the requisite showing has been made, the prosecution "must demonstrate that 'permissible racially neutral selection criteria and procedures have produced the monochromatic result;'" and

(3) in light of the parties' submissions, the trial court must determine if the "defendant has established purposeful discrimination."

**State v. Green**, 94-0887, p. 23 (La. 5/22/95), 655 So.2d 272, 287 (quoting **Hernandez v. New York**, 500 U.S. 352, 358-59 (1991)); accord **Batson**, 476 U.S. at 93-95. The burden of persuasion never shifts from the opponent of the strike. **State v. Nelson**, 10-1724, 10-1726, p. 15 (La. 3/13/12), 85 So.3d 21, 32 (quoting **Purkett v. Elem**, 514 U.S. 765, 768 (1995)). However, after the opponent of the strike establishes a *prima facie* case of racial discrimination, the burden of production shifts to the proponent of the strike to articulate race-neutral reasons for its use of peremptory challenges. See, e.g., **State v. Bender**, 13-1794, pp. 3-4 (La. 9/3/14), 152 So.3d 126, 129;[26] **Nelson**, 10-1724, 10-1726 at 10, 85 So.3d at 29; **State v. Draughn**,

---

[26] In **Bender**, 13-1794 at 4, 152 So.3d at 129, this court recently recognized:

> In the second **Batson** step, the burden of production or going forward shifts to the prosecutor, who must offer a "race-neutral" explanation for his exercise of peremptory strikes. [**Green**, 94-0887 at 25, 655 So.2d at 288]; La.C.Cr.P. art. 795(C). The **Batson** explanation [by the prosecutor] does not need to be persuasive, and unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed race-neutral. **Elie**, 05-1569 at p. 5, 936 So.2d at 795.

05-1825, p. 29 (La. 1/17/07), 950 So.2d 583, 605; **Green**, 94-0887 at 25, 655 So.2d at 288. Not until steps one and two of the **Batson** test have been satisfied is the trial court's duty under step three triggered. See **Johnson v. California**, 545 U.S. 162 (2005), which provides:

> The first two **Batson** steps govern the production of evidence that allows the trial court to determine the persuasiveness of the defendant's constitutional claim. "It is not until the third step that the persuasiveness of the justification becomes relevant–the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination."

*Id.*, at 171 (quoting **Purkett**, 514 U.S. at 768). In summary, the responsibility in the three-step **Batson** test falls first on the opponent of the strike in step one, then on the proponent of the strike in step two, and lastly, on the trial court in step three. The **Johnson** court elaborated on the critical importance of this tripartite framework:

> The **Batson** framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process. The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question. … The three-step process thus simultaneously serves the public purposes **Batson** is designed to vindicate and encourages prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process.

**Johnson**, 545 U.S. at 172 (citations and quotations omitted). This three-part process affords "the trial judge … the benefit of all relevant circumstances, including the prosecutor's explanation, before deciding whether it was more likely than not that the challenge was improperly motivated." *Id.* at 170.

The procedure for peremptorily striking venire persons is found in La. C.Cr.P. art. 795, which, in relevant part, provides:

> C. No peremptory challenge made by the state or the defendant shall be based solely upon the race or gender of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race or gender, and a prima facie case supporting that

28

objection is made by the objecting party, the court may demand a satisfactory race or gender neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror.  ...

To satisfy **Batson**'s first-step requirement for the establishment of a *prima facie* case of purposeful discrimination, a moving party need only produce "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred."  **State v. Elie**, 05-1569, p. 6 (La. 7/10/06), 936 So.2d 791, 796 (quoting **Johnson**, 545 U.S. at 170).  Concerning the *prima facie* case required in the first step of the **Batson** test, this court in **Green** stated:

> The first step in this process places a burden of production or of "going forward" on the defendant.  If the defendant is unable to make out a *prima facie* case of racial discrimination, then the **Batson** challenge fails and it is not necessary for the prosecutor to articulate "race-neutral" explanations for his strikes.  The defendant may offer any facts relevant to the question of the prosecutor's discriminatory intent to satisfy this burden.  Such facts include, but are not limited to, a pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor which support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury finally empaneled, and any other disparate impact upon the suspect class which is alleged to be the victim of purposeful discrimination.

**Green**, 94-0887 at 24, 655 So.2d at 287-88 (citations and footnote omitted); see also **Batson**, 476 U.S. at 97.  Concerning the disparate impact on a suspect class, this court noted "while deserving of some weight in the determination of whether purposeful discrimination exists, is not a dispositive factor, since '[a]n argument relating to the impact of a classification does not alone show its purpose.'"  **Green**, 94-0887 at 24 n.20, 655 So.2d at 288 n.20 (quoting **Hernandez**, 500 U.S. at 362).

Here, the trial court began its analysis of defendant's **Batson** challenge by stating: "The Court will state for the record its finding in there's been a prima facie showing."  This statement by the trial court indicates there has been a determination

29

that a "prima facie showing" has been made by defendant. The **Batson** analysis then requires the state to be called on to offer race-neutral reasons. However, the trial court proceeded to offer reasons why the state exercised all seven of its peremptory challenges, rather than requiring the state to do so as requested by defense counsel.

Subsequently, after the trial court articulated reasons for the state's peremptory challenges relative to these seven potential jurors, the trial court found "there is no prima facie showing at all as to systematic exclusion on the basis of race by the State's exercise of its peremptory challenges." Notwithstanding the latter ruling, the trial court later stated that it would "allow" counsel for the state, if he wished, "to justify or state for the record its race neutral … reasons," concluding "but those are my rulings."[27] The prosecutor declined the trial court's invitation relative to defendant's **Batson** challenge, and the trial court "note[d] the respective objections of counsel as to the Court's ruling."

Further confusing the matter, when later recapping its ruling in connection with defendant's **Batson** challenge, as well as a challenge made by the state pursuant to **Georgia v. McCollum**, 505 U.S. 42 (1992) (prohibiting defense challenges based on race), the trial court apparently considered the factors set forth in **Green** relative to defendant's burden of proving a "*prima facie* case of racial discrimination" in step one of the **Batson** test. See **Green**, 94-0887 at 24, 655 So.2d at 287-88.[28]

_____

[27] Because the trial court already articulated reasons why the state excused potential jurors and had actually ruled, such a practice is akin to giving someone the answers in advance of a test.

[28] Under **Green**, the defendant's mere highlighting of the state's use of five of its seven peremptory challenges "against Blacks" is one factor in determining whether a *prima facie* showing was made. See ***Id.*** 94-0887 at 24 n.20, 655 So.2d at 288 n.20; *cf.* **State v. Gibbs**, 31,370, p. 6 (La.App. 2 Cir. 2/24/99), 728 So.2d 945, 949 (Where the state "exercised peremptory challenges against 75% of black prospective jurors," the appellate court observed that defendant "has arguably made a prima facie case of discriminatory strikes."). Thus, while the mere number of strikes against a particular group of citizens does not mean there is discrimination, this factor alone can be persuasive.

In light of the trial court's actions in this case, this court is initially tasked with attempting to determine whether the *voir dire* process ever reached the second step of the **Batson** test. Despite the trial court's equivocation as to whether a *prima facie* case was established, in the role as a court tasked with reviewing whether the constitutional guarantee of equal protection was met, this court is not free to disregard the trial court's initial unqualified finding that a *prima facie* showing was made. Furthermore, in the absence of a *prima facie* showing in this case, it would have been unnecessary for the trial court to engage in any further analysis under **Batson**. See **Green**, 94-0887 at 24-25, 655 So.2d at 288. Thus, based on the trial court's initial statement that a *prima facie* showing of racial discrimination was made by the defense, review and analysis of the other steps in the **Batson** test are required.

Upon a *prima facie* showing by the opponent of a strike, **Batson** and its progeny require the proponent of a peremptory challenge to offer a race-neutral explanation for striking a potential juror.[29] Louisiana C.Cr.P. art. 795(C) seems to afford the trial court discretion in this regard: "the court **may demand** a satisfactory race or gender neutral reason for the exercise of the challenge, **unless the court is satisfied that such reason is apparent from the voir dire examination of the juror**." (Emphasis added.)

In **Elie**, this court evaluated La. C.Cr.P. art. 795(C) in light of the three-part test enunciated in **Batson**. The trial court in **Elie** did not to require the state to offer any explanation for striking three potential jurors since the exclusionary reasons were obvious from the record, and the trial court denied defendant's **Batson** challenge. **Elie**, 05-1569 at 7, 936 So.2d at 796. In reviewing defendant's challenge of the trial

---

[29] See **Nelson**, 10-1724, 10-1726 at 11, 85 So.3d at 30.

court's ruling, this court cautioned that the procedure utilized by the trial court in **Elie** and authorized by La. C.Cr.P. art. 795(C):

> does not accord with the observation in **Johnson** that the Court's evolving **Batson** jurisprudence "is designed to produce *actual answers* to suspicions and inferences that discrimination may have infected the jury selection process ... . [T]he inherent uncertainty present in inquiries of discriminatory purpose counsel against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question." **Johnson**, 545 U.S. at 172, 125 S.Ct. at 2418. [Emphasis added.]

**Elie**, 05-1569 at 7, 936 So.2d at 797. While recognizing the tension between La. C.Cr.P. art. 795(C) and the second step of the **Batson** test, as "elaborated upon in **Johnson**, **Miller-El** [**v. Dretke**, 545 U.S. 231 (2005)], and [**Rice v.] Collins**[, 546 U.S. 333 (2006)],"[30] the majority of this court found that the practice utilized by the trial court in **Elie** was acceptable under La. C.Cr.P. art. 795(C). See **Elie**, 05-1569 at 7-8, 14, 936 So.2d at 797, 801.

Ultimately, in **Elie**, a noncapital case, notwithstanding that the trial court articulated race-neutral reasons for several of the prosecution's strikes, this court found no discriminatory intent by the prosecution and, therefore, no equal protection violation. See *Id.*, 05-1569 at 14, 936 So.2d at 801. That ruling rested on this court's ability, as a reviewing court, to discern the trial court's analysis at each of the three steps of the **Batson** inquiry. At the first step, this court discerned that the trial court had made a *prima facie* finding. At the second step, this court observed that the trial court articulated race-neutral reasons for several strikes and the state had articulated reasons for other challenged strikes. See *id.*, 05-1569 at 7-9, 936 So.2d at 796-98. At the third step, this court ascertained that the trial court's ruling to deny the **Batson** challenges was objectively reasonable and made after considering "argument by both

---

[30] See **Elie**, 05-1569 at 4-5, 936 So.2d at 795.

sides" and evaluating the prosecutor's demeanor during *voir dire*, rather than based on "irrational or intuitive reasons." See *id.*, 05-1569 at 12, 936 So.2d at 800. Because the **Elie** court was able to review the sufficiency of each analytical step, it was able to defer to the trial court's conclusion that there had been no discriminatory intent. See **Elie**, 05-1569 at 14, 936 So.2d at 801 (citing **Hernandez**, 500 U.S. at 364, and **Rice v. Collins**, 546 U.S. 333, 339 (2006) ("A reviewing court owes the trial court's evaluations of discriminatory intent great deference and should not reverse them unless they are clearly erroneous.").

The record in the instant case hinders our ability to discern a clearly defined three-step **Batson** analysis. From all that appears, this court is left to conclude that the trial court conflated the three steps. After finding that the defense had established a *prima facie* case, the trial court later declared there was no *prima facie* showing. A finding of a *prima facie* case is not only a threshold for reaching the other **Batson** steps, but also serves to frame the issue for the parties and the trial court.[31] Furthermore, contravening the **Elie** court's admonishment relative to the second step in the **Batson** inquiry, rather than asking the prosecution for actual reasons for its peremptory strikes, the trial court speculated as to what race-neutral reasons might exist. In sum, without consistently identifying for itself whether or not a *prima facie* case had been established at step one, and without ascertaining the prosecution's actual reasons at step two, the trial court provided insufficient assurance that, when it came to step three, the court had framed the issue such that it could sufficiently evaluate the "weight and credibility to be given to the ... racially-neutral explanations." See **Elie**, 05-1569 at 12, 936 So.2d at 800. Moreover, as this court

---

[31] See **Batson**, 476 U.S. at 93-94 (indicating that a *prima facie* case identifies "the relevant facts giv[ing] rise to an inference of discriminatory purpose.").

previously explained, the first two steps may be combined when a party "offered race-neutral reasons" in response to a **Batson** challenge. **Nelson**, 10-1724, 10-1726 at 10, 85 So.3d at 29. Even then, however, a distinct "third step of weighing [the challenger's] proof and the "race-neutral reasons" is "critical." *Id.*

The record here also fails to justify departing from the **Elie** court's caution against a trial court surmising non-discriminatory reasons. Inconsistent statements in the record demonstrate problems with all three steps of **Batson**. This court reiterates concern about the second step. The jurisprudence of the United States Supreme Court on **Batson** is "evolving" and "is designed to produce *actual answers* to suspicions and inferences that discrimination may have infected the jury selection process." **Elie**, 05-1569 at 7, 936 So.2d at 797 (quoting **Johnson**, 545 U.S. at 172). Indeed, the caution furnished by this court in **Elie** was recently echoed by four of the eight Justices who currently comprise the United States Supreme Court.[32] Although defendant has not asked nor does this court here purport to decide the constitutionality of the last clause beginning with the word "unless" of La. C.Cr.P. art. 795(C) *per se*, the continued scrutiny given to that article should not go unnoticed by the bench and bar of this state.

Speculation by a trial court as to what the state's reasons might have been for striking potential jurors, may, if the record is sufficiently clear on all three steps of the **Batson** test, be sufficient to satisfy the requirements of **Batson**. **Elie** was such a case. However, nothing in **Elie** counseled that having the trial court supply reasons for the prosecution's peremptory strikes was a sound practice. This practice does not

---

[32] See **Williams v. Louisiana**, 136 S.Ct. 2156, 2156 (2016) (Justices Breyer, Ginsburg, Kagan, and Sotomayor concurred with a remand for further evaluating a **Batson** claim, citing *inter alia* **Elie**, 05-1569, 936 So. 2d 791). Because of the death of Justice Antonin Scalia, the Supreme Court was comprised of eight members.

conform with **Batson** and its progeny, which mandate that the state provide race-neutral reasons for the challenge even where those reasons are apparent from the *voir dire* examination. Clearly, the procedure outlined in La. C.Cr.P. art. 795(C) must yield to the demands of the Equal Protection Clause of the Constitution (as recognized in the evolving **Batson** jurisprudence). Therefore, the trial court's failure to call on the state in this case to provide race-neutral reasons upon its initial finding that a *prima facie* showing had been made resulted in a violation of defendant's and the potential jurors' equal protection rights and defendant's right to a fair trial.

The **Batson** Court declined to craft a remedy for the equal protection violation it had identified, instead leaving it to the lower courts to determine the appropriate remedy. See **Batson**, 476 U.S. at 99 n.24. The most common remedies adopted by trial courts are to either discharge the venire and select a new jury from a panel untainted by the discriminatory tactics or to disallow the discriminatory challenges and resume selection with the improperly challenged jurors reseated on the venire. See **Nelson**, 10-1724, 10-1726 at 18-25, 85 So.3d at 33-38. However, these remedies are unavailable when the error is raised in a post-trial posture.

Post-trial remedies include reversal of defendant's conviction, with a remand for a new trial, or remanding for an evidentiary hearing to have the prosecutor offer race-neutral explanations for the state's strikes.[33] Under the facts of this case, it is doubtful that an evidentiary hearing would serve to rectify the constitutional violations that resulted from the trial court's failure to order the prosecutor in this

---

[33] See **Nelson**, 10-1724, 10-1726 at 25, 85 So.3d at 38 (a substantial violation of defendant's constitutional right to a fair trial warranted reversal of defendant's conviction and sentence); **State v. Givens**, 99-3518, p. 8 (La. 1/17/01), 776 So.2d 443, 451 (this court remanded for an evidentiary hearing after finding the trial court failed to require the prosecutor to offer gender-neutral explanations for her strikes); **State v. Myers**, 99-1803, pp. 5-6 (La. 4/11/00), 761 So.2d 498, 502 (the trial court's error in failing to address defense counsel's **Batson** challenges warranted reversal of defendant's conviction).

case to articulate race-neutral reasons for his strikes, as required after the trial court made a *prima facie* finding. A meaningful hearing on this issue is all but impossible[34] because the state can simply reiterate the same reasons already crafted by the trial court. The inadequacy of such a remedy in this case is magnified by the fact that the prosecutor in this case is no longer with the district attorney's office and there is a new district attorney. Therefore, defendant's conviction and sentence are vacated, and this matter is remanded for a new trial.[35]

**DEFENDANT'S CONVICTIONS AND SENTENCES ARE VACATED; REMANDED TO THE TRIAL COURT FOR A NEW TRIAL.**

---

[34] See **Myers**, 99-1803 at 6-7, 761 So.2d 502-03.

[35] In light of this determination, all other issues raised by defendant are pretermitted.

SUPREME COURT OF LOUISIANA

No. 2014-KA-2153

STATE OF LOUISIANA

VERSUS

RODRICUS C. CRAWFORD

ON APPEAL
FROM THE FIRST JUDICIAL DISTRICT COURT,
FOR THE PARISH OF CADDO

**JOHNSON, C.J.** concurs in the result, and dissents in part for the reasons assigned by Knoll, **J.**

SUPREME COURT OF LOUISIANA

No. 2014-KA-2153

STATE OF LOUISIANA

VERSUS

RODRICUS C. CRAWFORD

**KNOLL, J., concurs in part and dissents in part.**

I agree fully with the Court's *Batson* analysis and strongly believe that this defendant's conviction and death sentence could be vacated on that basis. However, I heartily disagree with the majority's conclusion that there was sufficient evidence under *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979), to sustain defendant's conviction for the first-degree murder of his infant son. As the majority recognizes, where the conviction is based on circumstantial evidence, the prosecution's case must "exclude[] every reasonable hypothesis of innocence." *State v. Captville*, 448 So.2d 676, 678 (1984). Under *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319, 99 S.Ct. at 2789. Indeed, the touchstone of this inquiry is reasonableness. If the jury's verdict is not reasonable, the defendant's conviction cannot be maintained. Considering all of the evidence in the light most favorable to the prosecution, no rational trier fact could have concluded that the State presented sufficient evidence to prove beyond a reasonable doubt that the defendant had the specific intent to kill his one-year-old son or that the defendant killed the infant while he was engaged in the perpetration or attempted perpetration of cruelty to juveniles or second degree

cruelty to juveniles. *Id.*; La. Rev. Stat. 14:30(A)(1), (3). The State's entire case rested on forensic pathologist Dr. James G. Traylor's conclusion that the cause of the infant's death was "smothering with the mechanism of death being asphyxia." Indeed, during cross-examination, Dr. Traylor admitted, because none of the child's other evident injuries *caused* his death (i.e., had "anything to do with smothering"), the only evidence that led him to this conclusion that the infant was smothered was the abraded contusions on the undersides of the infant's upper lip and lower lip:

> Q. Now, Dr. Traylor –
>
> A. Yes.
>
> Q. –other than this picture right here – well, let me backtrack and rephrase. We've got all kind of evidence of possible abuse, right? There's stuff on the butt. There's stuff on the head, correct?
>
> A. Correct.
>
> Q. None of that other stuff has anything to do with smothering; that's correct, isn't it?
>
> A. That's correct.
>
> Q. This is the only picture [showing the abrasions and contusions under the infant's lip], the only thing that led you to the conclusion it was a smothering, correct?
>
> A. Yes.
>
> . . . .
>
> Q. But other than – I want to make sure I'm correct on this, and then I'll get off this horse. Other than this (Indicating), none of those other signs of possible abuse have anything to do with smothering; is that correct?
>
> A. Smothering in and of itself, no.
>
> Q. So this is it, right?
>
> A. That's it.

Indeed, the most that Dr. Traylor and Caddo Parish Coroner Dr. Todd Thoma could opine about these injuries is that this bruising was "*consistent*" with smothering:

2

Those are the typical injuries that if you're lucky enough to see with smothering other than possibly maybe a little abrasion to the tip of the nose from either a pillow or a sheet; you may see that. But typically, you know, it's referred to as a gentle homicide. Sometimes you don't get any indication of the smothering at all. I think it's fortunate that that was there in this particular case.

In *State v. Wright*, we determined that such testimony on its own is **not** legally sufficient to sustain a conviction and to carry the State's burden to prove specific intent beyond a reasonable doubt. 01-0322, p. 14 (La. 12/4/02), 834 So.2d 974, 986. Indeed, in *Wright*, the jury convicted the defendant of first-degree murder, finding, among other aggravating factors, that the defendant was engaged in the perpetration of an aggravated or forcible rape when he committed the murder of his girlfriend's six-year-old daughter. *Id.*, pp. 1-2, 834 So.2d at 978. Medical experts, after examining the victim's vaginal and rectal areas, opined that the victim had been vaginally and anally penetrated. *Id.*, pp. 13, 834 So.2d at 985-86. Nevertheless, they could not determine whether the injuries to the girl's vaginal area were caused by a sexual assault or caused by the victim being catheterized. *Id.* Similarly, there was evidence the victim's anus had been penetrated several times. *Id.* However, one expert could only opine that the injuries were "consistent with being penetrated by something anally," while another could not identify the object that penetrated the child, responding affirmatively when asked whether it could have been "a finger, thumb, broomstick, mop handle stick ... [or] male penis." *Id.*, pp. 13-14, 834 So.2d at 986. This Court held that such testimony was not sufficient to sustain the State's burden of proving specific intent:

> While this strongly suggests that defendant sexually assaulted the victim, we cannot say that the state successfully proved ***beyond a reasonable doubt*** that the murder took place during the perpetration or attempted perpetration of an aggravated or forcible rape.

*Id.*, p.14, 834 So.2d at 986 (emphasis added).

3

While in *Wright* the Court ultimately determined there were sufficient other grounds to support the defendant's conviction, including (but not limited to) the defendant's admission that he regularly beat the child, the excess of 2,000 blood spatters across the victim's home, the bloody children's underwear and bloody towels hidden under the child's bed, and the various lies and inconsistent statements the defendant gave to investigators,[1] the same is not true here. Dr. Traylor and Dr. Thoma both admitted they based their entire conclusion that the infant was smothered to death on the bruising in his inner lips, which they both stated was "consistent with" smothering. The majority attempts to minimize this significant issue by arguing that, in rebuttal, "Dr. Traylor stated, that however he phrased his testimony during the state's case-in-chief and under cross-examination, his unequivocal opinion was that 'the death of the child is the result of asphyxia, secondary to smothering.'" Opn., p. 22. The problem with crediting this statement is that nothing in Dr. Traylor's testimony or in his autopsy report provides ***an adequate factual basis*** for his conclusion or for his expressed certitude that smothering was the cause of the child's death. Simply put, the only thing Dr. Traylor can state with certainty is that ***someone*** applied pressure to the infant's mouth ***at some unspecified point*** and, critically, ***for some unspecified period of time***. He cannot say for how long the pressure was applied and he cannot relate the application of that pressure to the child's death. Dr. Traylor's testimony bears this out. On direct examination in the State's case-in-chief, Dr. Traylor testified that the abrasions or contusions upon which he relied to arrive at his conclusion could have been caused by applied pressure to the infant's mouth for a period of time that is much shorter than what would be necessary to suffocate the child:

_____

[1] *Id.*, pp. 11-12, 834 So.2d at 984-85.

4

Q. Taking State Exhibit 10 and State Exhibit 11 together, is it your opinion that those two photographs depict a condition of this baby that is, in your opinion, the result of applied pressure to the baby's mouth against the teeth?

A. Yes.

Q. Dr. Traylor, in order to obtain that type of abrasion or contusion in the upper and lower lips, do you have an opinion about how long that pressure would have to be maintained against the child's teeth?

A. *Well, you could certainly cause that from – simply from several seconds worth of pressure*. When I say "several seconds," you know, ten, fifteen, twenty seconds, but in order to – you know, *if the intent is to actually smother the child*, it's not like television. You don't put your hand over somebody's mouth and ten seconds later, they pass out. It actually takes a lot longer than that. So, you know, whether or not the individual that applied the pressure applied pressure forty-five seconds to a minute or whatever, but once the individual that the pressure is being applied to passes out, then they are not breathing anymore.

Q. So would it be your opinion that the time it would take to cause death by smothering in an infant of this type would be in the forty-five second range or different?

A. Somewhere around there. Maybe a minute total, you know, to have cause the death, at least a minute or more.

Critically, to reach his conclusion that the cause of the child's death was smothering, Dr. Traylor *must* assume "the intent is to actually smother the child." The evidence of bilateral bruising under the child's lips only indicates to him that someone placed pressure on the child's mouth for "several seconds…you know, ten, fifteen, twenty seconds." Dr. Traylor must assume, without any evidentiary support, that pressure was applied for a much longer period of time in order to arrive at the conclusion that the infant was smothered.

The problem is heightened by a dearth of evidence establishing defendant's specific intent. Under the State's theory of the case, specific intent was established because when defendant placed his hand over the infant's mouth, he did so with the *sole* intention of smothering him to death. However, if the injuries to the inner lips are merely "consistent with" smothering, and other scenarios could not be

5

excluded, then the State's theory establishing the element of specific intent also collapses. That bruising was the *only* proof the State offered of specific intent, much like it was the *only* injury that led Drs. Thoma and Traylor to conclude the victim's death was a homicide. Because the State offered no evidence to prove the injuries to the child's inner lips were caused by—rather than "consistent with"—smothering, viewing the evidence in the light most favorable to the prosecution, the State failed to establish beyond a reasonable doubt that defendant acted with specific intent to kill the baby.

The other signs of abuse evident on the child cannot salvage the State's case. Dr. Traylor's autopsy revealed multiple indications of abuse—including, bruising to the infant's forehead and both sides of his face, subcutaneous injuries to the infant's scalp over the back and the front and behind the right ear, and subcutaneous hemorrhages to the infant's buttocks. Throughout trial, the State sought to plant the inference that defendant inflicted these injuries on the baby in the hours in which defendant was alone with the child immediately before his death. Significantly, however, although every witness who saw the infant on the evening of February 15, 2012, testified that they did not see any bruising on the child's face before he went to bed, each of these witnesses also testified they never perceived any bruises on the child *after* he was found unresponsive in the defendant's room. For instance, Abigail Crawford testified on direct examination during the State's case-in-chief about the appearance of the infant after he was found unresponsive:

Q. And did you see any bruising on his face?
A. No, sir.
Q. And you got a good look at him?

6

A. I had a good look at him. I was looking because when he said something is wrong with Bobo I'm observing Bobo to see is any – you know, what is wrong with him.

Q. Okay. So you looked at his face.

A. I'm looking at him, I'm looking all over him.

Q. I mean, was the baby face up, you were holding by his –

A. Face up.

Q. – by his back?

A. Yes.

Q. So his face was facing your face?

A. Yes.

Q. And you saw no bruising about his forehead or his cheeks?

A. None.

Q. Did you see any scratch on the right side of his nose?

A. I did not.

Q. Okay. So no apparent injury to the child?

A. No.

Q. Correct?

A. Yes.

Given the dark pigmentation of the child's skin, as evidenced in the autopsy photos, it is unsurprising that these bruises were not perceptible to anyone except the medical professionals who examined the infant after his death and the child's mother who testified to seeing a bruise on the side of the child's face when she brought clothes and a nose syringe for the infant over to the defendant's house prior to the child's last evening alive. If the bruises were not perceptible the evening before the child's death, then the bruises could have been present for quite some time and could have been inflicted by any number of people, including the child's mother with whom the child primarily lived. Because, as Dr. Traylor admitted, "[t]here's really no accurate way to date a bruise," this evidence certainly is not sufficient to sustain the State's burden of proving specific intent.

7

Accordingly, although I concur in the majority's conclusion the *Batson* error in this case would otherwise warrant vacation of defendant's sentence and conviction, I dissent from the majority's determination that the State presented sufficient evidence to meet its burden of proof. Thus, I would reverse and vacate defendant's conviction and sentence and would dismiss the indictment.

SUPREME COURT OF LOUISIANA

No. 2014-KA-2153

STATE OF LOUISIANA

VERSUS

RODRICUS C. CRAWFORD

ON APPEAL

FROM THE FIRST JUDICIAL DISTRICT COURT,
FOR THE PARISH OF CADDO

**CRICHTON, J., dissents in part.**

I dissent from the majority opinion solely as to the remedy imposed. The majority reverses the decision of the trial court based upon the trial judge's articulation of race-neutral reasons under *Batson v. Kentucky*, 476 U.S. 79 (1986). Before hastily employing the drastic remedy of reversing the conviction, I would instead remand the case to the trial court for an evidentiary hearing to permit the state to offer race-neutral reasons for its peremptory strikes in accordance with the second step of *Batson*. *See*, *e.g.*, *Foster v. Chatman*, -- U.S. --, 136 S. Ct. 1737, 1747 (2016) ("[I]f that showing has been made, **the prosecution** must offer a race-neutral basis for striking the juror in question.") (emphasis added) (summarizing *Batson* three step process).

In reversing the conviction, the majority speculatively asserts that a "meaningful hearing on this issue is all but impossible" in the district court. But, in my view, a meaningful hearing on this issue in the trial court is certainly possible, and in fact could be easily accomplished, because: (i) there were at least two lawyers of record, one of whom is still employed by the district attorney's office and could represent the state on remand, and (ii) despite the fact that the original lead prosecutor no longer works for the district attorney, he is presumably

1

available should the current district attorney subpoena him to testify or otherwise seek his participation in such a hearing.[1] *Compare*, *e.g.*, *State v. Myers*, 99-1803 (La. 4/11/00), 761 So. 2d at 503 (reversing conviction after finding no opportunity for a "meaningful hearing" on remand for consideration of *Batson* first step where trial judge had died). As a result, I believe that the requirements of *Batson* would be satisfied by first remanding to the trial court to permit the state to, in the first instance, advance race-neutral reasons for its peremptory strikes.

---

[1] The jury of 12 persons in this case was comprised of nine white individuals and three African American individuals

2