HOLDRIDGE, J.
*363 The defendant, Simon Quinn, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1 (count 1); and obstruction of justice (by tampering with evidence), a violation of La. R.S. 14:130.1 (count 2). He pled not guilty and, following a jury trial, was found guilty as charged on both counts. The defendant filed a motion for new trial and motion for postverdict judgment of acquittal, which were denied. The State filed a habitual offender bill of information, seeking to enhance the obstruction of justice sentence. At a hearing on the matter, the defendant was adjudicated a second-felony habitual offender.[1] For the second degree murder conviction, the trial court sentenced the defendant to life imprisonment without benefit of parole, probation, or suspension of sentence. For the obstruction of justice conviction, the trial court imposed an enhanced sentence of fifty years imprisonment at hard labor without benefit of probation or suspension of sentence. The sentences were ordered to run consecutively. The defendant made an oral motion to reconsider sentence, which was denied. The defendant now appeals, designating two counseled assignments of error and four pro se assignments of error. We reverse the conviction and sentence for second degree murder. We affirm the conviction for obstruction of justice, habitual offender adjudication, and the enhanced fifty-year sentence at hard labor.
FACTS
The defendant lived at Ansley Place Apartments in Houma, Louisiana, and worked offshore. Robbie Coulon, the defendant's friend, had been the defendant's roommate for several months. Coulon, who did not have a job, was not listed as a tenant on the defendant's lease, which caused problems with the defendant and the apartment management. On May 6, 2015, while the defendant was working off-shore, Coulon pawned an Xbox video game console that belonged to the defendant's child at Cash America Pawn in Houma. This was the second time that Coulon had pawned the Xbox.
On May 7, 2015, at around 12:30 a.m. or 1:00 a.m., the defendant's girlfriend, Jeannie Gamble, arrived at the defendant's apartment. Coulon was at the apartment at the time and Gamble spoke with him for about 15 minutes. Gamble slept at the defendant's apartment and left at around 7:00 a.m. to drive to New Iberia to pick up the defendant, who had completed his offshore shift. Before Gamble left the apartment, Coulon asked her when she and the *364 defendant would be returning. Gamble picked up the defendant in New Iberia at approximately 9:00 a.m. in her brother's older model red Ford F-150 pick-up truck.
Gamble drove the defendant to his apartment, where they stayed briefly. Coulon was not at the apartment when they arrived. The defendant discovered that his son's Xbox was gone. According to Gamble, the defendant was "upset" about the Xbox, but was not blatantly irate and did not make any threats toward Coulon. The defendant took a shower, and because there were no clean towels, Gamble went through the apartment looking for dirty towels. Gamble stated that she went into Coulon's room, where she looked into Coulon's closet for dirty towels, and saw "a lot" of empty alcohol bottles. While at the apartment, Gamble and the defendant consumed crystal methamphetamine. Because the defendant was unhappy with the quality of the drugs, the two left the apartment, the defendant dropped Gamble off at a McDonald's restaurant, and went to purchase more drugs.
The defendant returned shortly, picked up Gamble, and the pair went to Gamble's house. On the way there, the defendant spoke of finding an alternative way to get the Xbox out of the pawn shop because his son was supposed to be visiting that weekend. Gamble confirmed that the defendant was texting on the drive, but could not say definitively with whom the defendant was communicating.
After spending about a half-hour at Gamble's house, where Gamble again consumed drugs, the defendant and Gamble drove back to the defendant's apartment. According to Gamble, the defendant was anxious to return to the apartment and was concerned something may be getting destroyed there. When the two arrived at the apartment at around 1:00 p.m., Gamble walked into the defendant's bedroom, and the defendant followed her into his room. The defendant then turned around and walked out of the room. Gamble was standing with her back to the door and assumed that the defendant was going to speak to Coulon. Gamble stated that she heard no noises while the defendant was gone and that he returned to his bedroom less than five minutes later. Gamble stated that when the defendant came back to his room, he was "white as a ghost" and was shaking and trembling. The defendant told her, "I can't believe it, I can't believe it, he did it," to which Gamble asked the defendant, "did what[?]" The defendant replied that Coulon had killed himself. The defendant then started rambling about his freedom, having old warrants, having just started to be able to see his children again, and having just started a new job. At trial, Gamble explained that the defendant had recently moved into the apartment and was "starting on a new foot;" she assumed that if the police were called, the warrants would then come to light, and the defendant would be arrested, losing the ability to see his children. Gamble did not go into Coulon's room because she "didn't want to know anything about anything." According to Gamble, the defendant mentioned "moving the body." The two discussed several options, including the defendant's suggestion that they get an "offshore bag" for the body, then left for Gamble's house, without deciding what they would do.
The defendant and Gamble stayed at Gamble's house until about 11:00 p.m. and, according to Gamble, while they were there, they did not discuss what happened at the defendant's apartment. The defendant told Gamble he needed to be by the water to think. The defendant and Gamble drove around the Dularge area, near the water, and to the Terrebonne General area. Gamble described the defendant walking alone down a boat launch for approximately *365 fifteen minutes. She indicated that at one point the defendant speculated that Coulon might not be dead. Driving her brother's red Ford truck, the defendant dropped Gamble off at her house around 4:00 a.m. The defendant told Gamble he was going to talk to his mother's friend.
On the morning of May 8, 2015, at around 7:00 a.m., the defendant returned to Gamble's house and told her he had gone back to the apartment with a friend of his mother's and another friend. He told her he stayed in the car while one of the men went upstairs and talked to Coulon, who was alive, and made arrangements for Coulon to leave. The defendant left again in the truck and later that day told Gamble he had helped a friend tow a car and showed her a picture of himself standing by the water.
Gamble testified that she dropped the defendant off at his apartment later that day because his children were visiting. She did not go into the apartment at that time, but did go inside the next day, when she returned the defendant's debit card, which was left in the truck. Gamble stated that they did not discuss Coulon, she did not drive the defendant back to work for his next offshore trip, and she did not see the defendant again.
On May 12, 2015, the defendant went to the Cash America Pawn shop to attempt to retrieve his son's Xbox. The defendant, who was visibly angry at the time, was told he would need to produce the original pawn receipt or get Coulon to come into the shop with identification. The defendant stated that he did not want to get police involved, and told the pawn shop owner that Coulon was "out of town and he's not coming back."
On May 13, 2015, fishermen noticed a "tote" floating upside down against the shore near a dock in Cocodrie, Louisiana. On May 14, 2015, the fishermen were going to retrieve the container for their own use; however, when one of the fishermen tossed a rope to his deckhand to tie the boat up on the dock, the fishermen noticed the tote had some clothing coming out of it, saw some pants and an arm, and a call was made to 911. Detectives Glynn Prestenbach, Jr. and Billy Dupre with the Terrebonne Parish Sheriff's Office heard a call over the radio indicating that a body had been found in Cocodrie and headed to the scene. They found Coulon's decomposing body, face-down, half inside a Rubbermaid container and half outside of the container. Detective Prestenbach saw a plastic bag wrapped around Coulon's feet, a dark green sheet over Coulon's head and feet, a plastic bag over Coulon's head, and black electrical tape wrapped around all of this. He also observed some thin rope and a sheet with a gold and white floral pattern that was "kind of under but around the head area" and a cinder block under the body.
Detective Dupre was tasked with the duty to go to local stores to see if he could find a Rubbermaid container that matched the container at the scene. On May 19, 2015, Detective Dupre found a 54-gallon container at a Home Depot in Houma that matched the one in which Coulon's body was found. Detective Dupre discovered from a store associate that a white male purchased such a container on May 8, 2015. The associate provided Detective Dupre with the purchase receipt and video surveillance of the purchase. The surveillance footage showed a man exiting an older model red Ford F-150 truck in the Home Depot parking lot on the morning of May 8, 2015. The man's face was not clearly visible in the surveillance footage; however, according to Detective Dupre, who was familiar with the defendant prior to this investigation, the man in the video *366 appeared to have the same body build and stature as the defendant. The man in the video went into the Home Depot and purchased a 54-gallon Rubbermaid container and some rope. He was wearing a black baseball hat with white logos on its front and back, and a gray shirt with two emblems on the chest. The man also purchased a package of Manila rope, paid using cash, and loaded the container into the bed of the pick-up truck.
After interviewing various persons, including Gamble, the defendant's ex-wife, Tanya Quinn, and Leslie Rogers, with whom the defendant had a prior relationship, a search warrant was obtained for the defendant's apartment. During two searches, officers found a gray shirt with a Nike logo on one side and a company symbol on the other side, which appeared to match the shirt worn by the man in the Home Depot surveillance video. Officers also collected some brownish colored bedsheets that appeared to match the sheet found with Coulon's body, a black roll of electrical tape, a bundle of black garbage bags, and two green curtains, which, according to Detective Prestenbach, looked similar to the ones found with the body. A black hat matching the one the man in the video wore was located in Rogers' truck. Rogers, who gave the defendant a ride to work prior to his arrest, identified the hat as belonging to the defendant.
The Terrebonne Parish Sherriff's office took custody of the defendant in Vermillion Parish and brought him to the Terrebonne station on May 15, 2015, for questioning. Detective Prestenbach interviewed the defendant after the defendant waived his Miranda rights. At that time, the defendant made a statement. Reading from his report, Detective Prestenbach testified:
Mr. Quinn advised for the week that he was in we didn't see Robbie much, but they talked to him. I asked him who we, which Simon advised he talked to Rainie and Leslie. Simon advised he came in on Thursday and the [sic] Friday was the last day he had spoke [sic] with Robbie. He advised Robbie sent him a text message to hurry to the apartment. Simon advised that he forbidded [sic] Robbie to drink at the apartment, so he would not stay at the apartment much when Simon was in from work. I asked Simon about the last conversation he had with Robbie, which he advised Robbie was upset and said he wanted to leave. Simon advised Robbie told him he was going with some people that he met, but Robbie had a history of lying. Simon advised he told Robbie whatever you want to do as long as you are safe. I asked Simon if he saw Robbie on Friday, which he advised that all of Robbie's items were gone from the apartment. I asked Simon about his XBox, which he advised it was the second time Robbie had pawned the XBox. He advised he spoke with Robbie about the XBox, which Robbie told him he would get it back. Simon advised that he knew the XBox was at the pawn shop on Martin Luther King, but he was unable to get it back. I asked Simon why he did not call the police about the XBox because TPSO could have assisted him with recovering the XBox, which he advised he did not call because of his outstanding arrest warrant. Simon advised he had 2 attorneys working on this warrant. I did ask Simon if he knew what happened to Robbie, which he advised he had some friends call him and told him that TPSO was investigating and was looking to talk to him about Robbie. Simon then advised he did not wish to say anything else without his attorney.
Detective Prestenbach found the defendant's statement inconsistent with information he acquired during his investigation, *367 and he placed the defendant under arrest for second degree murder. Detective Prestenbach also obtained the defendant's phone records and cell phone tower information, as well as surveillance videos from several businesses in the Cocodrie area where Coulon's body was found. The videos collectively showed an older model red Ford F-150 truck, resembling Gamble's brother's truck, driving to and from the Cocodrie area on the afternoon of May 8, 2015. Cell phone tower records tracked the defendant's phone moving south on that date, with the phone pinging a cell tower in Cocodrie, slightly north of where Coulon's body was recovered, at 12:54 p.m. The records then track the phone moving back towards Houma.
The defendant's ex-wife, Tanya Quinn, who was married to the defendant for 11 years, testified at trial that the defendant was not the type of person who would harm anyone. She had known Coulon for approximately three months, and described Coulon as someone who liked "to drink a lot." She also described Coulon as "manic," and testified that Coulon made Facebook posts in which he stated that he "was always going to end his life and stuff like that." Quinn testified that she visited the defendant in jail after his arrest and asked him what happened. The defendant told her, "I did that. I put him there." Quinn stated she felt the defendant was lying to her because she could not believe it, and felt like the defendant was "covering something up" and did not sound truthful. When asked specifically what the defendant told her, Quinn stated that he told her only that "he put the body there," but that he did not say that he killed Coulon. Quinn testified that the defendant said he found Coulon "like that" and panicked because he already had a prior charge and did not want to go to prison and be away from his children.
Rogers, the defendant's friend, testified that she had known the defendant since junior high school and had a brief relationship with the defendant from March through May of 2015. Rogers was also friends with Coulon, first meeting him in January of 2015. Rogers indicated that she did not know Coulon well, although she was around him often. During Rogers' relationship with the defendant, Coulon stayed at the defendant's apartment. Rogers testified that the defendant treated Coulon like a brother and helped him financially. Rogers admitted that when she was first contacted by police in this matter, she told them she had not been in contact with the defendant, although she had been in contact with the defendant. She stated that the second time she spoke with police, she told them that she was in a relationship with the defendant and had been in contact with him. Rogers explained that at the first encounter, she thought it was a missing person investigation and was not aware it was a murder investigation. Text messages exchanged between Rogers and the defendant on May 8, 2015, were introduced into evidence. The defendant texted Rogers and told her to tell Coulon's girlfriend, Rainey Voisin, to stay away from the apartment. Rogers texted the defendant that Voisin seemed to think Coulon was dead in the apartment; the defendant replied to tell Voisin that the maintenance people were there that morning, threatened to evict him, and that Coulon had left the night before, saying he had somewhere else to stay. On May 14, 2015, Rogers texted the defendant to tell him the police were coming to talk her, and they needed to get their story straight. The defendant replied, "[t]that's okay, we're going to make Rainey out to be the one full of lies. Which she is."
A heavily redacted copy of text messages exchanged by the defendant and Coulon on May 7, 2015, was also introduced *368 into evidence. This evidence showed that the defendant texted Coulon that morning to tell him he was onshore and was a couple of hours away from Houma. Coulon texted the defendant that he would be back in a couple of days because he was too embarrassed to see the defendant. Coulon informed the defendant that he was trying to get a job so that he could move from the apartment. The defendant texted Coulon that he needed to think, he had to make sure he was not evicted, and that he would speak to Coulon later that day around 4:00 p.m. Coulon texted the defendant that he "was so wrong about the Xbox" and was "so wrong about [your kids'] stuff it [doesn't] matter what its for." The defendant texted Coulon, "If you would play by the basic rules we talked about so many times before I left last week ... Don't sell my children's stuff, and Don't get me evicted by walking by the office when they forbid you to be there when I'm not home. It was so easy." The defendant also asked Coulon exactly what days he had walked on and off the property so that he could have some sort of argument with "these people," indicating that they were "pissed off according to the voice-mail." Several minutes later, the defendant texted Coulon to tell him he was not angry and that he was trying to "salvage" their apartment. Coulon exchanged the following texts with the defendant: "I cant do this anymore im finished done. It's ok for Leslie and jeanie but not for me. Put the paper in my room ill sign it then your free ... Ill take care of myself the one way I know how." The defendant assured Coulon he was not turning his back on him, and Coulon later replied, "You have a very small window and then im gone." The defendant replied, "I'm coming. I wish you would just get some rest. Sleep it off Robbie."
Dr. Cameron Snider, who performed the autopsy on Coulon's body on May 15, 2015, found Coulon's body to be in a state of mild bloating-type decomposition, which he described as a very early process of decomposition. The body was nude when Dr. Snider received it. It had been reported to Dr. Snider that a plastic bag was around the head when the body was found and that the bag had been removed. He also received information regarding the presence of a bed sheet around the neck. Dr. Snider's examination revealed no evidence of recent injury, including no evidence of any facial, lingual, oral, or ocular injuries, and no hemorrhages of the strap muscles or soft tissue of the neck. Dr. Snider testified that he did not find any defensive wounds or bruises on Coulon's body, confirming that in the state of decomposition Coulon's body was in at the time of the autopsy, he could have seen such evidence. However, there were no skin tears or bruises on Coulon's body.
Dr. Snider was able to determine that Coulon thed from asphyxia, or the lack of adequate oxygen to the body. In Dr. Snider's expert opinion, however, the cause of asphyxia was undetermined, as Dr. Snider could not determine the mechanism and manner of how Coulon was deprived of oxygen and could not determine whether the oxygen deprivation was self-inflicted or a homicide. Dr. Snider stated that he ultimately concluded that the manner of death was undetermined because there were no types of injuries on Coulon's body at all.
Dr. Snider offered three possible mechanisms of Coulon's asphyxia. First, Dr. Snider noted that alcohol was found in Coulon's brain tissue, but because the body was decomposed, he could not determine a quantitative level of alcohol. Dr. Snider opined that one of the possibilities in this case is that Coulon may have died from respiratory failure due to marked alcohol intoxication prior to the placement of his body in the Rubbermaid container. He noted, *369 however, that death from heavy alcohol intoxication is rare in adults and with people who are accustomed to drinking alcohol. Dr. Snider found no evidence of chronic use of alcohol in examining Coulon's liver.
The second possibility Dr. Snider proposed for the oxygen deprivation was vascular compression of the large vessels of the neck due to the placement of a bed sheet around the neck, either a self-inflicted hanging or placement by others. Dr. Snider explained that a bed sheet could be wrapped around the neck and compress the jugular veins and the carotid artieries, but because it is so broad and flat it might not leave any significant marks. Dr. Snider noted that he sees this mechanism used by prison inmates who decide to hang themselves.
The last possibility Dr. Snider identified as a source of oxygen deprivation was suffocation by placement of a plastic bag over the head, again either self-inflicted or placed by others. Dr. Snider stated this method may be possible in a suicide situation, but less likely in a homicide situation. According to Dr. Snider, if someone tried to kill a person by placing a plastic bag over his head, such would take longer, and the victim would have time to react and struggle and would probably incur defensive wounds during that struggle. However, Dr. Snider found no defensive wounds on Coulon's body.
When asked to "rank" the various possibilities, Dr. Snider stated, "the bed sheet, maybe plastic bag, unlikely alcohol [over-intoxication]." Dr. Snider acknowledged that one of the main reasons he could not determine which of the three possibilities occurred in this case and why he could not tell whether Coulon's death was self-inflicted or a homicide was because of the decomposed condition of Coulon's body.
SUFFICIENCY OF THE EVIDENCE
In his first counseled and pro se assignments of error, the defendant argues the evidence was insufficient to support both convictions of second degree murder and obstruction of justice (by tampering with evidence).
"[N]o person shall be made to suffer the onus of a criminal conviction except upon sufficient proof - defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." Jackson v. Virginia, 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Crawford, 2014-2153 (La. 11/16/16), 218 So.3d 13, 26. A conviction based on insufficient evidence cannot stand, as it violates due process. U.S. Const. amend. XIV, La. Const. art. I, § 2. In reviewing claims challenging the sufficiency of the evidence, a reviewing court, examining all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. La. Code Crim. Pro. art. 821B; State v. Crawford, 218 So.3d at 26-27.
When circumstantial evidence forms the basis of the conviction, the prosecution's case must exclude every reasonable hypothesis of innocence. La. R.S. 15:438 ; State v. Crawford, 218 So.3d at 28 ; State v. Oliphant, 2013-2973 (La. 2/21/14), 133 So.3d 1255, 1258 (per curiam ); State v. Captville, 448 So.2d 676, 678 (La. 1984). In circumstantial evidence cases, a reviewing court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. Rather, the reviewing court, examining the evidence in the light most favorable to the prosecution, determines whether the possible alternative *370 hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under the Jackson v. Virginia standard. State v. Crawford, 218 So.3d at 26 (citing State v. Davis, 1992-1623 (La. 5/23/94), 637 So.2d 1012, 1020.
The Jackson standard does not allow an appellate court to substitute its own appreciation of the facts for that of the factfinder. Id. It is not the province of the reviewing court to assess witness credibility or reweigh the evidence. Rather, as the Supreme Court explained in State v. Crawford, 218 So.3d at 20, quoting from State v. Mussall, 523 So.2d 1305, 1310 (La. 1988) :
If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all of the evidence most favorable to the prosecution must be adopted. Thus, irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process. (Footnote omitted.)
Obstruction of Justice Conviction
The crime of obstruction of justice is:
[A]ny of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as hereinafter described:
(1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance either:
(a) At the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or United States law enforcement officers; or
(b) At the location of storage, transfer, or place of review of any such evidence.
La. R.S. 14:130.1A (prior to its amendment by Acts 2016, No. 215, § 1).
The defendant contends the State did not prove the elements of the crime of obstruction of justice. He suggests that because of the video quality, the State did not prove he was the white male who went to Home Depot and bought a plastic tote. He similarly suggests the State could not prove definitively through the video surveillance of several local businesses that he was driving the red truck. Further, the defendant points to the State's "glaring" omission of any "evidence on how [he] moved the body [ (from the apartment,) ] down three flights of stairs[,] and into the truck."
While the man's face was not clearly visible in the Home Depot surveillance footage, Deputy Dupre testified the man in the footage was of the same build and stature as the defendant. The defendant's black hat with logos matching the hat in the video footage was located in a friend's vehicle. Further, during a search of the defendant's apartment, police found a gray shirt with a Nike logo and a company symbol on the other side, which appeared to match the shirt worn by the man in the Home Depot surveillance video.
Moreover, surveillance videos from several businesses in the Cocodrie area where Coulon's body was found depict an older model red Ford F-150 truck resembling *371 Gamble's brother's truck driving to and away from the Cocodrie area on the afternoon of May 8, 2015. The defendant's cell phone records revealed that the defendant's cell phone signal hit a tower on May 8, 2015, at 1:54 p.m., in Cocodrie, slightly north of where Coulon's body was found, and the records tracked the phone moving back north toward Houma thereafter.
Additionally, the searches of the defendant's apartment yielded bed sheets that appeared similar to the one found with Coulon's body, black electrical tape, and a bundle of black garbage bags. Also, the defendant's ex-wife testified the defendant admitted to her that he "put" Coulon's body "there."
Furthermore, the defendant's behavior and actions upon with respect to the disposal of Coulon's body sufficiently established a guilty mind. Upon discovering the body, the defendant did not call the police or 911, but immediately began discussing how to dispose of Coulon's body. The defendant lied to the police when questioned about Coulon's disappearance. The evidence indicated he sought to create an alternative alibi with a far-fetched story that Coulon was actually still alive when he and Gamble left the apartment, and that he returned to the apartment with friends who made arrangements for Coulon to leave. A finding of purposeful misrepresentation reasonably raises the inference of a "guilty mind." State v. Captville, 448 So.2d at 680, fn.4. Furthermore, lying has been recognized as indicative of an awareness of wrongdoing. Id.
Based on the foregoing, we find that any rational juror could have concluded that the defendant disposed of Coulon's body. Accordingly, we find that the State proved beyond a reasonable doubt that the defendant was guilty of obstruction of justice by tampering with evidence.
Second Degree Murder Conviction
Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1A(1). Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent may be formed in an instant. State v. Mickelson, 2012-2539 (La. 9/3/14), 149 So.3d 178, 182. Because it is a state of mind, specific intent need not be proven as a fact, but may be inferred from circumstances surrounding the defendant's actions. State v. Mickelson, 149 So.3d at 182.
The State's theory of the case, presented through arguments to the jury, was that the defendant and Coulon's longtime friendship had deteriorated to the point that the defendant's anger and animosity toward Coulon led the defendant to take out his rage and aggression toward Coulon by murdering him. In opening arguments, the State theorized that the defendant was in Coulon's room for "some 5 plus minutes" and in those "5 plus minutes," the defendant took a bag, put it over Coulon's head and suffocated him. In closing arguments, the State acknowledged that even if the defendant was with Coulon for only three minutes, such was sufficient time for the defendant to kill Coulon with a bed sheet across the neck. The defendant's attorney argued to the jury that there was no murder.
The State's only evidence regarding how Coulon thed was introduced through the testimony of Dr. Snider, who found that while the cause of death was asphyxia (lack of oxygen to the body), the manner in which Coulon was deprived of oxygen could not be determined. Dr. Snider was unable to determine if Coulon's death was *372 a murder or a suicide. There was no evidence demonstrating that any injury of any type was inflicted upon Coulon by the defendant that caused Coulon's death. Dr. Snider basically refuted the State's theory that the defendant murdered Coulon by placing a plastic bag over his head, thereby depriving Coulon of oxygen. He acknowledged that it was possible for Coulon to have killed himself in that way, but in a murder situation, the victim of such an attack would have time to react and struggle and would probably have defensive wounds on his body, which Coulon did not. Thus, when asked to rank the possible mechanisms of Coulon's death, the best the Dr. Snider was able to say was "maybe plastic bag," but clearly could not say that Coulon was the victim of murder by another person placing that plastic bag over his head. Dr. Snider further opined that Coulon's neck could have been compressed by a bed sheet, used as a ligature, but noted that, because of the decomposing condition of the body, he could not confirm this manner of death because he could see no marks that may have been detectible had he received Coulon's body sooner. However, Dr. Snider found evidence of Coulon's alcohol consumption, and also theorized that it was possible that Coulon may have died from alcohol intoxication. In any event, Dr. Snider could not determine whether Coulon's death was self-inflicted or caused by another person.
Furthermore, the jury was presented with the reasonable alternative hypothesis that Coulon had committed suicide. According to Gamble, she was with the defendant in his apartment when the defendant found Coulon dead in Coulon's bedroom. Gamble indicated that the defendant left from his bedroom and came back to his bedroom less than five minutes later and told her that Coulon had killed himself. There is no evidence to refute Gamble's testimony. Importantly, there is no evidence showing that Coulon was alive at the time the defendant entered Coulon's room, and there is no evidence establishing that the defendant was in fact in Coulon's room for the entirety of the less than five minutes that transpired between the time the defendant left his bedroom and returned to his bedroom to tell Gamble that Coulon had killed himself.
Moreover, there was testimonial evidence that suggested Coulon was, indeed, suicidal.[2] Quinn testified that Coulon liked to drink a lot, and that he was "manic," and had even made Facebook posts saying that he was going to end his life. On May 7, 2015, Coulon had texted the defendant that he could not do this anymore, he was finished, done, and that he would take care of himself the one way he knew how. Coulon wrote, "You have a very small window and then I'm gone."
After reviewing the entire record, we conclude that any rational trier of fact, after viewing all of the evidence as favorable to the prosecution as a rational fact finder can, necessarily must have had a reasonable doubt as to the defendant's guilt on the second degree murder charge. The State did not prove that Coulon was in fact the victim of a murder, and because the jury was presented with the reasonable hypothesis that Coulon committed suicide, the State failed to meet its burden of excluding every reasonable hypothesis of innocence in this case. Thus, examining the evidence in the light most favorable to the prosecution, we find the alternative hypothesis *373 that Coulon committed suicide to be sufficiently reasonable that a rational juror could not have found proof that the defendant was guilty of murdering Coulon beyond a reasonable doubt under the Jackson standard. Under the facts of this case, we can only conclude that the jury engaged in impermissible speculation in determining the defendant's guilt. See State v. Mussall, 523 So.2d at 1311.
For the foregoing reasons, we find that the evidence was sufficient to support the obstruction of justice conviction. The evidence, however, was legally insufficient to support the second degree murder conviction and, accordingly, that conviction and the life sentence for that conviction are hereby reversed.
CONSECUTIVE SENTENCES
In his second counseled assignment of error, the defendant argues the trial court erred in ordering the enhanced fifty-year sentence on the obstruction of justice conviction to run consecutive to the life imprisonment sentence imposed on the second degree murder conviction. Because we have reversed the defendant's second degree murder conviction and the sentence imposed on that conviction, this assignment of error is moot.
RIGHT TO PRESENT A DEFENSE
In a pro se assignment of error, the defendant contends that in ruling on the State's motion in limine, filed on the morning of trial and which sought to preclude the defense from introducing all out of court statements by various fact witnesses regarding Coulon's having suicidal thoughts or tendencies in the past, prevented him from presenting a suicide defense. Because we have overturned the defendant's conviction for second degree murder, this assignment of error is moot.
DENIAL OF POST-TRIAL MOTIONS
In his third pro se assignment of error, the defendant argues the trial court erred in denying his motions for new trial and postverdict judgment of acquittal. These motions were premised on the alleged lack of evidence supporting the convictions and the trial court's ruling on the motion in limine. We have found no merit in the defendant's sufficiency claim with respect to the obstruction of justice conviction and likewise, as to that conviction, we find this assignment of error meritless. In light of our reversal of the defendant's second degree murder conviction and life sentence, this assignment of error is moot.
TRIAL TRANSCRIPT
In his fourth pro se assignment of error, the defendant argues he was deprived of due process and equal protection because the court reporter failed to transcribe his entire trial. Specifically, he complains that the trial transcript does not include the ruling concerning defense counsel's objection to the trial court's granting of the State's motion in limine and arguments and rulings made at two bench conferences, which were not transcribed. The defendant contends that the missing trial transcript concerned his right to submit a "suicide" defense to the jury. The defendant contends that without a complete record of the bench conferences, portions of the proceedings could not be used to prepare his appeal and, as such, his right of appellate review is rendered meaningless. Because we have reversed the defendant's conviction for second-degree murder, these arguments with respect to that conviction are moot. Thus, our review is limited to any error associated with the obstruction of justice conviction.
A criminal defendant has a right to a complete transcript of the trial proceedings, particularly, whereas here, *374 appellate counsel was not counsel at trial. See Hardy v. United States, 375 U.S. 277, 84 S.Ct. 424, 11 L.Ed.2d 331 (1964) ; State v. Robinson, 387 So.2d 1143 (La. 1980). Further, in Louisiana, a defendant is constitutionally guaranteed the right of appeal "based upon a complete record of all the evidence upon which the judgment is based." La. Const. art. I, § 19. Thus, material omissions from the transcript of the proceedings at trial bearing on the merits of an appeal will require reversal. On the other hand, inconsequential omissions or slight inaccuracies do not require reversal, as an incomplete record may nonetheless be adequate for appellate review. See State v. Castleberry, 1998-1388 (La. 4/13/99), 758 So.2d 749, 773, cert. denied, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999) ; State v. Hawkins, 1996-0766 (La. 1/14/97), 688 So.2d 473, 480 ; State v. Allen, 95-1754 (La. 9/5/96), 682 So.2d 713, 722. Finally, a defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcripts. See La. Code Crim. P. art. 843 ; State v. Deruise, 1998-0541 (La. 4/3/01), 802 So.2d 1224, 1234, cert. denied, 534 U.S. 926, 122 S.Ct. 283, 151 L.Ed.2d 208 (2001).
The record indicates that during the testimony of Rogers, two discussions were held off the record which were not transcribed. The defendant has not demonstrated any specific prejudice which he suffered as a result of those off-the-record bench discussions not being transcribed; nor does anything in the record suggest that these discussions had a discernible impact on the proceedings. See State v. Deruise, 802 So.2d at 1236-37. There is nothing in these two unrecorded exchanges that would suggest the defendant was prevented from presenting any relevant evidence or that any prejudice resulted from the absence in the record. Accordingly, the absence from the record of two unrecorded bench conferences did not deny the defendant effective appellate review. See State v. Brumfield, 1996-2667 (La. 10/20/98), 737 So.2d 660, 669-70, cert. denied, 526 U.S. 1025, 119 S.Ct. 1267, 143 L.Ed.2d 362 (1999). This pro se assignment of error lacks merit.
CONCLUSION
For the foregoing reasons, the defendant's conviction for obstruction of justice, habitual offender adjudication, and enhanced fifty-year sentence at hard labor without benefit of probation or suspension of sentence are affirmed. The defendant's conviction and life sentence for second degree murder are hereby reversed.
CONVICTION FOR OBSTRUCTION OF JUSTICE, HABITUAL OFFENDER ADJUDICATION, AND ENHANCED FIFTY-YEAR SENTENCE AT HARD LABOR WITHOUT BENEFIT OF PROBATION OR SUSPENSION OF SENTENCE AFFIRMED; CONVICTION AND LIFE SENTENCE WITHOUT BENEFIT OF PAROLE, PROBATION OR SUSPENSION OF SENTENCE FOR SECOND DEGREE MURDER REVERSED.
McDonald, J. concurs.
Crain, J. dissents in part and assigns reasons
CRAIN, J., dissents in part.
Louisiana's circumstantial evidence test does not supplant the Jackson standard of review and does not provide a reviewing court with a vehicle for substituting its appreciation of what the evidence has or has not proven for that of the factfinder. State v. Mack, 13-1311 (La. 5/7/14), 144 So.3d 983, 989. The jury considered the evidence presented at trial, including the defendant's revelation that Coulon was dead, the defendant's physical reaction in making that revelation, the defendant's *375 failure to seek help or report Coulon's death to the police, and the defendant's actions in disposing of Coulon's body. When that evidence is viewed in the light most favorable to the state, it was rational for the jury to find beyond a reasonable doubt the essential elements of second degree murder were proven and all reasonable hypotheses of the defendant's innocence, including the defendant's theory that Coulon committed suicide, had been excluded. The majority exceeds its role as a reviewing court and usurps the role of the factfinder by re-weighing the evidence then substituting its own appreciation of what the evidence did or did not prove for that of the factfinder. See State v. Mitchell, 99-3342 (La. 10/17/00), 772 So.2d 78, 83. Stated another way, the majority impinges on the jury's discretion beyond the extent necessary to guarantee the fundamental protection of due process of law by accepting a hypothesis of innocence reasonably rejected by the jury. State v. Mire, 14-2295 (La. 1/27/16), 269 So.3d 698, ---- (per curiam ) ( 2016 WL 314814 ). The defendant's murder conviction and sentence should be upheld with his conviction and sentence for obstruction of justice.

The defendant has a prior felony conviction for possession of a Schedule IV controlled dangerous substance. In its habitual offender bill of information, the State sought to enhance only the obstruction of justice sentence.

The record reflects that the State actively sought to exclude evidence of Coulon's suicidal thoughts or tendencies, filing a motion in limine on the morning of trial seeking to exclude all statements made by Coulon to the State's fact witnesses regarding Coulon's suicidal thoughts on the basis that such statements constituted inadmissible hearsay.