STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2023 KA 1153

STATE OF LOUISIANA

VERSUS

TRAVIS ORSO

*Judgment Rendered:*     DEC 0 6 2024

* * * * * * * *

Appealed from the
17th Judicial District Court
In and for the Parish of Lafourche
State of Louisiana
Case No. 597684, Division A

The Honorable Rebecca N. Robichaux, Judge Presiding

* * * * * * * *

| | |
|---|---|
| Jane Hogan<br>Hammond, Louisiana | Counsel for Defendant/Appellant<br>Travis Haxford Orso |
| Kristine Russell<br>District Attorney<br>Joseph S. Soignet<br>Jason Chatagnier<br>Assistant District Attorneys<br>Thibodaux, Louisiana | Counsel for Appellee<br>State of Louisiana |

* * * * * * * *

BEFORE: THERIOT, CHUTZ, AND HESTER, JJ.

**THERIOT, J.**

The defendant, Travis Orso, was charged by grand jury indictment with second degree murder, in violation of La. R.S. 14:30.1. He pled not guilty and, following a jury trial, was convicted as charged. The defendant filed a motion for post-verdict judgment of acquittal and a motion for new trial, both of which were denied at a hearing. After the defendant waived the sentencing delay, the trial court sentenced him to life imprisonment without the benefit of parole, probation, or suspension of sentence. The defendant now appeals, alleging the trial court erred in denying his motion for post-verdict judgment of acquittal because the evidence was insufficient to support his conviction. For the following reasons, we reverse his conviction and vacate his sentence.

## FACTS

On May 21, 2020, the victim, Dione Cheramie, was pronounced dead after she drowned in Bayou Lafourche. The defendant, Cheramie's boyfriend, was present when first responders arrived on the scene. The defendant provided oral statements to officers with the Lafourche Parish Sheriff's Office ("LPSO"), wherein he claimed Cheramie jumped into the bayou and he jumped in after her but was unable to save her from drowning. He was arrested for second degree murder following an interview with police.

## ASSIGNMENT OF ERROR

In his sole assignment of error, the defendant asserts the trial court erred in denying his motion for post-verdict judgment of acquittal, because the evidence presented at trial was insufficient to support his second degree murder conviction. Specifically, the defendant argues the State failed to prove a homicide occurred, and he argues the evidence was insufficient to prove he had the requisite specific intent.

A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of reviewing a claim of insufficient evidence is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the State proved the essential elements of the crime. See **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); **State v. Crawford**, 2014-2153 (La. 11/16/16), 218 So.3d 13, 26. The **Jackson** standard of review, incorporated in La. Code Crim. P. art. 821(B), is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. **State v. Welch**, 2019-0826 (La. App. 1st Cir. 2/21/20), 297 So.3d 23, 27, writ denied, 2020-00554 (La. 9/29/20), 301 So.3d 1193.

When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 mandates "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This is not a separate test for evaluating the evidence; rather, all of the evidence, both direct and circumstantial, must be sufficient under **Jackson** to convince a rational juror the defendant is guilty beyond a reasonable doubt. **State v. Dorsey**, 2010-0216 (La. 9/7/11), 74 So.3d 603, 633, cert. denied, 566 U.S. 930, 132 S.Ct. 1859, 182 L.Ed.2d 658 (2012). When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. **State v. Captville**, 448 So.2d 676, 680 (La. 1984); **State v. Bessie**, 2021-1117 (La. App. 1st Cir. 4/8/22), 342 So.3d 17, 22, writ denied, 2022-00846 (La. 9/20/22), 346 So.3d 802.

Second degree murder is defined, in pertinent part, as a killing committed "[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La. R.S. 14:30.1(A)(1). Specific intent is "that state of mind which exists when the

circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. **State v. Draughn**, 2005-1825 (La. 1/17/07), 950 So.2d 583, 592-93, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). Specific intent can be formed in an instant. **State v. Cousan**, 94-2503 (La. 11/25/96), 684 So.2d 382, 390. Specific intent is an ultimate legal conclusion to be resolved by the factfinder. **Welch**, 297 So.3d at 27.

Voluntary intoxication is a defense to a specific intent offense if the circumstances demonstrate the intoxication precluded the formation of the requisite intent. La. R.S. 14:15(2). In **State v. Mickelson**, 2012-2539 (La. 9/3/14), 149 So.3d 178, 183 (citations omitted), the supreme court set out the standard for proving an intoxication defense:

> The defendant has the burden of proving his intoxication defense; thereafter, it falls to the state to negate that defense by showing beyond a reasonable doubt that specific intent was present despite the defendant's alleged intoxication. Whether voluntary intoxication in a particular case is sufficient to preclude specific intent is a question to be resolved by the trier of fact.

At trial, Shane Hotard, the defendant's stepson from a previous marriage, testified that on May 21, 2020, the defendant and Cheramie went to his house on East 138th Street around 3:00 p.m. According to Hotard, both the defendant and Cheramie, whom he had not met before, appeared to have been "drinking or on something." Hotard said the defendant was stumbling and sloppy, so he told the defendant to go out on the porch, where the defendant passed out for about thirty minutes. Hotard testified Cheramie was drinking and taking medication while the defendant was asleep, though Hotard did not know what kind of medication. When the defendant woke up, he started arguing with Hotard and then fell and

4

broke the porch railing. Later, Hotard and the defendant got into an altercation and Hotard asked the defendant to leave. Hotard testified there was an argument about not letting the defendant drive, and during the argument Cheramie threw multiple drinks at the defendant. Hotard testified that to his knowledge, the defendant was driving when they left his house. Hotard said it was less than a five-minute drive from his house to where the defendant pulled over near the bayou.

Margaret Pitre testified she heard an argument between Hotard and the defendant at about 5:00 p.m. on May 21, 2020. She said she walked over to Hotard's house to intervene, but the argument continued for another thirty minutes. According to Pitre, the defendant appeared to be drunk, and Cheramie had a drink in her hand but was not falling down or stumbling like the defendant. However, Pitre said she had never met Cheramie before and could not judge Cheramie's condition. Pitre confirmed Cheramie threw her drink can at the defendant's face, later testifying she thought the defendant was going to hit Cheramie when she threw the drink. Pitre said she did not see the defendant strike or push Cheramie and testified she had known the defendant for twenty years and never knew him to be violent.

Angela Plaisance testified that on the day of the incident, she was driving down the bayou and saw a truck swerving in the road as if the driver was intoxicated or texting. Plaisance testified that at one point, the driver pulled over on the side of the road, and she saw the driver exit the truck and run around the truck frantically.

Perry Bruce testified he was riding his bike near the bayou on the day of the incident, and he heard a man yell for help. However, Bruce did not see what happened.

Richard Cheramie, Jr., testified he lived near Bayou Lafourche on Highway 308 between East 153rd and 154th Street.[1] Richard testified that around 5:00 p.m. on the day of the incident, he observed a white pickup truck parked near the bayou and saw an individual, whom he identified as the defendant at trial, standing waist-deep in the bayou. Richard estimated the defendant was between twenty and thirty feet from the bayou bank, and Richard testified the defendant appeared angry as he was moving his arms and yelling.[2] Richard said he could not hear what the defendant was yelling. According to Richard, the water was about three feet deep where the defendant was standing, and he did not see anyone else in the water. Richard testified he walked towards the bayou and asked the defendant if he needed help, at which point the defendant told Richard to call 911 and told him his girlfriend drowned.

Richard testified he first saw Cheramie floating face-down in the water after he dialed 911, and the defendant was pushing Cheramie toward him. Richard and one of his neighbors pulled Cheramie halfway out of the water.[3] Richard said he flipped Cheramie's body over, removed mud from her mouth and nostrils, and performed CPR until the paramedics arrived. According to Richard, the defendant never attempted to help in any way and called Cheramie "every word in the book[,]" including a "F-ing B[.]" Richard claimed the defendant grabbed a beer from the back of his truck and drank it, and he observed scratches on the defendant's chest and stomach. Richard testified that based on the defendant's behavior, the defendant's failure to help, and the presence of the scratches, he told the responding officer "they should take [the defendant] away." On cross-

---

[1] There was no known relation between the victim and Richard Cheramie. However, given they have the same last name, we will refer to Richard Cheramie by his first name to avoid confusion.
[2] On redirect, the State questioned Richard about his previous statement to police wherein he claimed the defendant was between six and ten feet from the bank. Richard said he would have "remembered a lot better" when he gave the statement on May 26, 2020.
[3] Richard testified that while the defendant was pushing Cheramie's body to the bank, she was face-down and the defendant did not attempt to get her head out of the water.

examination, Richard testified the defendant's eyes were bloodshot and he was obviously impaired. Based on his knowledge of the bayou, Richard agreed that if someone jumped in the shallow water face-first, the person would hit the bottom "pretty hard," which could result in injuries.

Jude Pierce, a patrol deputy with the LPSO at the time of the incident, was dispatched to respond to the drowning. Deputy Pierce testified he spoke with Richard, who provided basic information, but he did not recall Richard telling him to take the defendant into custody. Deputy Pierce said the defendant was visibly upset and clearly intoxicated, testifying the defendant smelled of alcohol. Deputy Pierce placed the defendant in his patrol car for safety purposes and thereafter transported him to the police station. He did not perform a field sobriety test or attempt to ascertain the defendant's blood alcohol concentration.

Joseph Anderson, a detective with the LPSO at the time of the incident, testified the defendant was crying in the back of a patrol car when Detective Anderson spoke with him. Detective Anderson recorded his interaction with the defendant, which was published for the jury. The defendant was audibly crying and told Detective Anderson, "We was [sic] arguing and she got out the truck and just jumped in the bayou. We been [sic] together for over a year and she just jumped in the bayou and I jumped in after her and she couldn't swim and I tried saving her."

Detective Gerard Lotz testified he and Lieutenant Ben Dempster brought the defendant to the police station for questioning, but at that point, the police were under the impression it was an accidental drowning. The defendant was advised of and waived his **Miranda**[4] rights, and he thereafter provided a statement to the police. It was Detective Lotz's opinion the defendant did not appear to be intoxicated. Detective Lotz testified that after reviewing the surveillance footage and receiving the defendant's statement, the police arrested the defendant for

---

[4] **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

second degree murder. Detectives Lotz and Anderson photographed scratches on the defendant's back, chest, shoulder, and legs and apparent bruises on the defendant's right lower calf. Detective Lotz testified he was unable to determine when the injuries occurred and was advised by the defendant that the injuries may have been a result of his earlier altercation with Hotard.

Lieutenant Dempster, who interviewed the defendant along with Detective Lotz, described the defendant's demeanor as distraught and disheveled. Lieutenant Dempster said he could tell the defendant had been drinking, because the defendant informed them he had been drinking and smelled of alcohol. However, Lieutenant Dempster did not think the defendant was intoxicated to the point that he did not understand what was happening. The State published an audio recording of the defendant's interview with Detective Lotz and Lieutenant Dempster.[5] The drowning occurred around 6:00 p.m., and the interview started at 1:06 a.m. the next morning.

During the interview, the defendant recounted his day, specifically that he went to the park with his cousin, Victor Weaver, to drink a beer that morning and went to his stepson's house with Cheramie later in the day. The defendant remembered getting into an altercation with his stepson and thereafter leaving his house. The defendant said while he was driving, Cheramie told him to pull over and, when he did, she "went and jumped in the bayou." According to the defendant, he was still in the truck when she jumped in, and she was about six to eight feet from the bank when he reached her. He claimed he tried pulling her back to the bank, but she was fighting him and trying to get away until she "stopped fighting." The defendant said he again tried to pull her to the bank, but she was deadweight and he could not reach the bottom. When asked, the defendant said he did not know if Cheramie hit her head when she jumped, because it happened so

---

[5] Lieutenant Dempster testified he used a digital recorder to take the defendant's statement because the LPSO substation did not have video recording capability.

8

quickly. He indicated that Cheramie took Seroquel and Xanax and was severely depressed after her father died a month ago. When the police asked about the surveillance video showing the defendant at the passenger side door before Cheramie jumped in, the defendant said he did not remember talking with Cheramie at the door. The defendant said all he remembered was jumping in the water after Cheramie and her fighting him. He told the police he never got out of the water and estimated the incident lasted about five minutes.

The surveillance video, which was published for the jury, shows the defendant's truck pull over and the defendant can be seen exiting the truck. For a few moments, the defendant remained outside the passenger side door before walking away. Then, Cheramie exited the truck and jumped in the bayou, and the defendant jumped in immediately thereafter. The video shows the defendant getting out of the water at one point, walking to his truck, and then jumping back in the bayou. The video shows Perry Bruce riding his bicycle and individuals running to the bayou. However, the distance makes it impossible to ascertain what occurred in the water.

Zachary Sciortino, a patrol sergeant and a salvage and recovery diver with the LPSO, testified his role in the investigation was to determine the water depth and composition of the bottom of the bayou, which he did on May 22, 2020. At twenty-one feet from the bank, the water depth was 3.2 feet and the composition of the bayou was mud, and at twenty-five feet from the bank, the water depth was 3.5 feet and the composition of the bayou was mud. Sergeant Sciortino, who was five-foot four-inches tall, testified the water depth significantly changed at some point after the twenty-five foot mark and was over the top of his head. On cross-examination, Sergeant Sciortino testified that he noted in his report that he routinely sank about six to eight inches in the mud.

Doctor Ellen Connor, who was accepted as an expert in forensic pathology at trial, performed the autopsy on Cheramie. Dr. Connor's autopsy report indicated the cause of Cheramie's death was drowning and multiple blunt force injuries, and the manner of her death was homicide. Dr. Connor testified Cheramie's lungs were full and expanded, and muddy fluid was present in the sphenoid sinus, supporting a finding of drowning. Regarding the blunt force injuries, Dr. Connor testified Cheramie had multiple contusions on her stomach, extremities, and head, all of which were photographed. Dr. Connor said she could not determine with confidence when the injuries were inflicted, and according to Dr. Connor, a body may bruise immediately after death. Toxicology analysis revealed alprazolam (or "Xanax"), quetiapine, amitriptyline, nortriptyline, and alcohol in Cheramie's system, though Dr. Connor testified the levels were not lethal. Dr. Connor testified Xanax was prescribed to treat anxiety, and amitriptyline was prescribed to treat depression. On cross-examination, Dr. Connor testified blunt force injuries could occur as a result of a physical altercation, falling down, or jumping face-first into shallow water, among other ways. Dr. Connor said even if she had been told that Cheramie had jumped in a bayou and fallen down multiple times in the days leading up to the drowning, she still would have considered classifying Cheramie's death as a homicide due to the surveillance video.

The defense called Tammy Hamilton, the defendant's sister, who testified the defendant's life drastically changed after his wife died of a blood clot in the brain. Hamilton said the defendant did not know how to grieve and began drinking, hanging out with the wrong people, missing work, and getting DWIs as a result. According to Hamilton, when she met Cheramie in December 2019 or January 2020, Cheramie pulled down her pants to show Hamilton her scar from a hip surgery. Hamilton testified she was shocked and felt like Cheramie's actions were due to medication. Hamilton said Cheramie would get her medications

10

delivered to Hamilton's post office box and would ask Hamilton to pick up her medications from the pharmacy.

Joanne Griffin owned a RV park in Golden Meadow, where the defendant lived and worked as the maintenance man. Though Griffin said she had never met Cheramie, she had seen her around the RV park. Griffin testified that she witnessed Cheramie sitting on Griffin's porch alone one day, talking to a pack of cigarettes as if it was a cell phone. Another time, Griffin said she passed the defendant's camper and heard Cheramie yelling, cursing, and throwing things. Though she initially thought the defendant and Cheramie might have been arguing inside the camper, she saw that the defendant was outside working on her son's boat. Griffin did not know whether Cheramie was alone in the camper but knew the defendant was not in there.

Abel Danos, Jr., Griffin's son, testified he had known the defendant since the defendant was about ten years old. Danos described the defendant as a gentle giant and said he had seen the defendant refuse to defend himself after being hit by a man. Danos testified that he hired the defendant to help repair his boats and occasionally hired Cheramie to help clean up. According to Danos, a few days before the incident, he received a call that Cheramie had jumped into a bayou that was not more than two feet deep. Danos testified that when he arrived, Cheramie was crying, cursing, covered in mud, and told Danos he did not "know what [she] had] been through[.]" Danos said Cheramie appeared to be intoxicated and had scratches on her hands, legs, and arms as a result of the incident. Danos testified the day prior to her drowning, he saw Cheramie fall thirty inches face-first off of the back of a RV onto gravel and limestone. Danos said Cheramie busted her face, her nose was bleeding, and "she had some other scuffs and stuff on her." When Danos asked her if she wanted an ambulance, she started cursing and hollering at her dogs, and then crawled back towards the RV. Danos testified Cheramie was

wearing only a t-shirt and underwear at the time. Danos said as he was leaving the RV park later that day, he saw Cheramie on the ground again. On cross-examination, Danos acknowledged he had not reported the incidents to law enforcement.

Victor Weaver testified he, Cheramie, and the defendant went to the Golden Meadow Park to smoke a joint on the morning of May 21, 2020. Weaver said Cheramie smoked medical marijuana, took a couple of pain pills and drank Corona slims while she talked about her fall the previous day. According to Weaver, the defendant consumed a bottle of Mad Dog 20/20. Weaver testified he had never seen the defendant act aggressively towards Cheramie, and he classified the defendant as a gentle giant.

The defense recalled Hotard, who testified he had never had an experience with the defendant as bad as the one he had on May 21, 2020. He testified the defendant and Cheramie were both drunk that day, and although Cheramie threw her drink at him, he never saw the defendant become violent with Cheramie. Following Hotard's testimony, the defense rested, and the defendant was thereafter found guilty of second degree murder.

On appeal, the defendant asserts the evidence was insufficient to support his second degree murder conviction, because: (1) the evidence did not establish beyond a reasonable doubt that a homicide occurred, and (2) the State failed to prove the defendant possessed the specific intent to kill or inflict great bodily harm. The defendant contends the circumstantial evidence failed to exclude every reasonable hypothesis of innocence, specifically that Cheramie accidentally drowned after she jumped in the bayou while heavily medicated. Moreover, the defendant argues his state of intoxication, caused by his alcohol consumption,

rendered him incapable of forming the requisite specific intent for second degree murder.[6]

In contrast, the State argues the defense's hypothesis of innocence was presented to the jury, which it reasonably rejected. Additionally, the State notes that an appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the factfinder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). Thus, the State asserts the evidence was legally sufficient to convict the defendant of second degree murder.

Here, the State's case rested largely on circumstantial evidence. Circumstantial evidence is "evidence of one fact, or a set of facts, from which the existence of the fact to be determined may reasonably be inferred." **State v. Chism**, 436 So.2d 464, 468 (La. 1983). The **Jackson** standard "leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" **Coleman v. Johnson**, 566 U.S. 650, 655, 132 S.Ct. 2060, 2064, 182 L.Ed.2d 978 (2012). Importantly, the due process standard in **Jackson** does not allow a jury to speculate on the probabilities of guilt where rational jurors would necessarily entertain a reasonable doubt. **State v. Mussall**, 523 So.2d 1305, 1311 (La. 1988). The central question in this case is whether the jury, in finding the defendant guilty of second degree murder, engaged in impermissible speculation or made reasonable inferences based on the circumstantial evidence. We find that a rational trier of fact, viewing the evidence in the light most favorable to the State, could only speculate as to whether there was a homicide; the evidence, even viewed in a pro-prosecution light, did not exclude beyond a reasonable doubt that

---

[6] The defendant filed a notice of intent to use the affirmative defense of voluntary intoxication in accordance with La. R.S. 14:15.

Cheramie's death was accidental. Accordingly, we must reverse the defendant's conviction.

The defendant was developed as a suspect due to bruises and scratches on his body and Cheramie's body, his callous behavior following the drowning, and the perceived discrepancies between the defendant's statement to police and the surveillance video. The defendant maintained his innocence and claimed he was unable to save Cheramie from accidentally drowning after she jumped in the bayou. Richard, who had extensive knowledge of the bayou, testified that if someone jumped in the shallow water face-first as the defendant claimed, the person would likely hit the bottom and sustain injuries. Sergeant Sciortino said the composition of the bottom of the bayou was predominately mud, which could reasonably explain the mud in Cheramie's mouth and nostrils. Further, Dr. Connor testified the blunt force injuries on Cheramie's body could have occurred as a result of a physical altercation, falling down, or jumping face-first into shallow water. Dr. Connor testified her conclusion of homicide was, at least, partially based on the surveillance video.

The surveillance video shows the defendant's truck pull to the side of the road before the defendant exited and walked to the passenger side door. Cheramie jumped in the bayou a few minutes later, and then, the defendant jumped in after her. However, it is impossible to determine what occurred in the water after the defendant jumped in. Bruce, who was riding his bike on the other side of the bayou, said he heard the defendant yelling for help, and Richard testified as he walked towards the bayou, the defendant told Richard to call 911 and told him his girlfriend drowned. It is also important to note Richard was the only individual who testified regarding the defendant's crass and callous behavior while he was attempting to save Cheramie. No other witness alleged the defendant called Cheramie profane names or exhibited a careless attitude. In fact, the audio, which

was recorded shortly after the drowning, depicts the defendant audibly crying in the patrol car while speaking with police, and he provided a voluntary statement to the police nearly seven hours later.

The jury was presented with photographic evidence of bruises and scratches on both Cheramie and the defendant. The autopsy photographs showed Cheramie had multiple contusions on her stomach, extremities, and head. However, Dr. Connor could not determine when the injuries were inflicted, and according to Dr. Connor, a body may bruise immediately after death, such as during life-saving measures. Further, Danos' testimony revealed Cheramie had sustained injuries in the days prior to the drowning. He testified that Cheramie jumped into a shallow bayou while intoxicated and scratched her hands, legs, and arms. Danos also testified Cheramie had fallen face-first onto gravel and limestone, busting her face. Thus, the jury could only speculate as to whether the injuries occurred when Cheramie jumped in the shallow bayou, when Cheramie fell multiple times, or when she drowned in Bayou Lafourche. Further, Hotard and Pitre testified the defendant engaged in a physical altercation with Hotard that day, and the defendant told officers his injuries were a result of that altercation. Hotard additionally testified the defendant fell off his porch and broke the railing, which was yet another means by which the defendant could have reasonably sustained the injuries depicted in the photographs.

Numerous witnesses testified the defendant appeared intoxicated and smelled of alcohol immediately before and after Cheramie's drowning. Hotard and Weaver witnessed the defendant consuming alcohol that day, and Richard testified the defendant's eyes were bloodshot and he was obviously impaired at the time of the drowning. There was also ample evidence of Cheramie's history of alcohol and medication consumption as well as her mental instability. In his interview with police, the defendant stated Cheramie took Seroquel and Xanax, and she was

severely depressed after her father's recent death. Coupled with Cheramie jumping into the bayou a few days before the incident, it is reasonable to conclude Cheramie jumped into the bayou while medicated and accidentally drowned.

In **State v. Quinn**, 2018-0664 (La. App. 1st Cir. 3/27/19), 275 So.3d 360, aff'd, 2019-647 (La. 9/9/20), 340 So.3d 829 (per curiam), cert. denied, ___ U.S. ___, 141 S.Ct. 1406, 209 L.Ed.2d 139 (2021), this court found there was insufficient evidence after the State failed to prove the victim was murdered with corroborating evidence and failed to exclude the reasonable hypothesis the victim died from another mechanism. In **Quinn**, Quinn was convicted of second degree murder and obstruction of justice. It was not disputed that the victim died of asphyxiation, but it could not be determined whether the death was suicide or caused by another person. There was evidence that Quinn was alone with the victim for less than five minutes and that the victim was, in fact, suicidal. This court reversed Quinn's second degree murder conviction:

> After reviewing the entire record, we conclude that any rational trier of fact, after viewing all of the evidence as favorable to the prosecution as a rational fact finder can, necessarily must have had a reasonable doubt as to the defendant's guilt on the second degree murder charge. The State did not prove that [the victim] was in fact the victim of a murder, and because the jury was presented with the reasonable hypothesis that [the victim] committed suicide, the State failed to meet its burden of excluding every reasonable hypothesis of innocence in this case. Thus, examining the evidence in the light most favorable to the prosecution, we find the alternative hypothesis that [the victim] committed suicide to be sufficiently reasonable that a rational juror could not have found proof that the defendant was guilty of murdering [the victim] beyond a reasonable doubt under the *Jackson* standard. Under the facts of this case, we can only conclude that the jury engaged in impermissible speculation in determining the defendant's guilt. See *State v. Mussall*, 523 So.2d at 1311.

**Id.** at 372-73 (alterations added).

The supreme court affirmed this court's holding, finding virtually the only evidence for the jury to infer guilt from was Quinn's act of concealing the victim's death, and that evidence by itself was not enough to render Quinn's hypothesis of

16

innocence unreasonable. **Quinn**, 340 So.3d at 834-35. Similarly, in the present case, virtually the only evidence for the jury to infer guilt from was the defendant's alleged callous behavior after the drowning and the surveillance video that had some inconsistencies with the defendant's statements about when he and Cheramie exited the vehicle.

Louisiana Revised Statutes 15:438 does not establish a stricter standard of review than the more general rational juror's reasonable doubt formula enunciated by **Jackson**; rather the circumstantial evidence rule serves as a helpful evidentiary guide for jurors. **State v. Major**, 2003-3522 (La. 12/1/04), 888 So.2d 798, 801. The requirement that jurors reasonably reject the hypothesis of innocence advanced by the defendant in a case of circumstantial evidence presupposes that a rational rejection of that hypothesis is based on the evidence presented, not mere speculation. See **Quinn**, 340 So.3d at 834; **State v. Schwander**, 345 So.2d 1173, 1175 (La. 1977). In **State v. Davis**, 92-1623 (La. 5/23/94), 637 So.2d 1012, 1020, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994), the supreme court explained:

> In circumstantial evidence cases, this court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. Rather, this court, evaluating the evidence in the light most favorable to the prosecution, determines whether the possible alternative hypothesis is sufficiently **reasonable** that a rational juror could not have found proof of guilt beyond a reasonable doubt under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). La. R.S. 15:438; *State v. Captville*, 448 So.2d 676, 678 (La. 1984); *State v. Rosiere*, 488 So.2d 965 (La. 1986).

This court finds that it was not rational for the jury to conclude the defendant drowned Cheramie and that it was not rational for the jury to conclude the State negated all reasonable probability that she accidentally drowned. Even evaluating the evidence in the light most favorable to the prosecution, giving deference to the jury's assessment of credibility and weighing of the evidence, and without

substituting our own appreciation of the facts for that of the jury, this court finds the alternative hypothesis of death by accidental drowning in this case is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under **Jackson**. See **Crawford**, 218 So.3d at 29. We find a rational trier of fact could not find beyond a reasonable doubt the defendant committed second degree murder. We find the jury's rejection of the defendant's hypothesis of innocence was not rational under the facts of this case.

## DECREE

For the foregoing reasons, the conviction of defendant, Travis Orso, is reversed, and the sentence of life imprisonment at hard labor without benefits is vacated and set aside.

**CONVICTION REVERSED AND SENTENCE VACATED.**